[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Procedural History
The plaintiff sued the defendants Christopher H. McLaughlin (McLaughlin) and Atlas Paving Company, Inc. (Atlas) for specific performances of a real estate purchase and sale agreement, alleging that the legal description of the property as ultimately conveyed was different from the description referred to in the purchase and sale agreement. The plaintiff also claimed money damages, alleging that the differences in description constituted fraud.
McLaughlin and Atlas asserted by way of special defenses that the modification of the property description was fully disclosed to and known by the plaintiff and his attorney, Russell E. Vile (Vile), that the plaintiff consented to the modification by closing on the property despite knowledge of the modification description, that by proceeding with the closing the plaintiff waived his right to complain about the modified description and is estopped to complain about the modified configuration of the property.
Thereafter, the plaintiff impleaded Vile as a defendant, alleging that he committed malpractice in his representation of the plaintiff in the purchase of the property. That portion of this action was resolved by Vile's payment of a sum of money to the plaintiff, and the plaintiff's withdrawal of the malpractice action against Vile.
The plaintiff no longer seeks money damages. His claim as presented at trial is limited to specific performance of the purchase and sale agreement.
II. Facts
By a purchase and sale agreement dated May 3, 1993, the plaintiff and McLaughlin initially contracted to buy and sell CT Page 8778 real property known generally as 10 Polaris Street in the Town of Groton. No legal description was appended to the agreement; the property was described by reference to the deed to McLaughlin recorded at Volume 463, Page 94 of the Groton Land Records. The deed, in turn, describes the property as two lots, Nos. 49 and 50, as depicted on a subdivision map of "Bailey Hill Estates".
After the purchase and sale agreement was executed McLaughlin remembered that the southeasterly corner of the subject property should be rounded off to accommodate the installation of a roadway to be known as "Whittaker" Lane for a subdivision on adjacent property owned by Atlas, a corporation owned by McLaughlin. Accordingly, McLaughlin effected a "land swap" between his property and the Atlas property.
The land swap was as follows: a roughly triangular parcel at the southeasterly corner or the subject premises, consisting 134 square feet, was conveyed to Atlas, resulting in a rounded corner. This conveyance is depicted on a map entitled "Plan Showing Land of Christopher H. McLaughlin To Be Conveyed to Atlas Paving Company, Inc., Polaris Street, Groton, Connecticut" (Pl. Ex. 6), referred to at the trial as "Parcel A". In return, another triangular parcel at the northeasterly corner of the subject premises, consisting of 332 square feet, was conveyed by Atlas to McLaughlin. This conveyance is depicted on a map entitled "Plan Showing Land of Christopher H. McLaughlin, Whittaker Lane, Groton, Connecticut" (Pl. Ex. 7), referred to at the trial as "Parcel B". The net result of the swap of "Parcel A" for "Parcel B" was that the subject premises continued to contain almost the exact same area (varying from the original configuration by only 2 square feet), but the southeasterly corner at the intersection of Polaris Street and the planned Whittaker Lane was rounded off.
The deed describing "Parcel A" was dated June 1, 1993, and recorded on June 3, 1993, in Volume 567, Page 981 of the Groton Land Records. The deed describing "Parcel B" was dated June 2, 1993, and recorded on June 3, 1993, in Volume 567, Page 983 of the Groton Land Records. The land swap was recorded on the land records more than three weeks before the closing of the sale, which occurred on June 29, 1993.
The parties agree on the foregoing facts. As to subsequent events, their positions begin to diverge. The plaintiff contends that he was not aware of the land swap and the existence of a planned subdivision roadway to be known as "Whittaker Lane", and CT Page 8779 that he had not consented to the modified description. Atlas and McLaughlin contend that the land swap was fully disclosed to, known by and consented to by Vile as the plaintiff's attorney and the plaintiff himself, and the plaintiff consented to the modified description by consummating the closing while aware of the roadway known as "Whittaker Lane".
During the time that this transaction was undertaken, Schmidt was not represented. (Testimony of Schmidt and Vile.) Attorney Mary Driscoll (Driscoll) did not contact Mr. Schmidt nor the real estate agent to advise them that there had been a change to the property. She assumed it would be picked up by the title searcher and should be straightened out at the closing. In late June, shortly before the closing on the sale, Schmidt retained Attorney Russell Vile to represent him in the purchase of 10 Polaris Street. Vile received the purchase and sale contract by FAX and immediately contracted with a third party to conduct a title search of premises described in the contract.
A day or two before the closing, Vile received the report from the title searcher which revealed that Parcel B had been "swapped" for Parcel A in a transaction between defendants McLaughlin and Atlas. Vile then called Driscoll inquiring about the "Swap" and was told that there had been a change to the property and that maps illustrating the change would be brought to the closing. The closing on the sale of 10 Polaris Street occurred on June 29, 1993, at Vile's office. Driscoll brought "mylar" maps showing Parcels A and B to the closing and gave them to Vile. Driscoll also provided Vile with a certificate of title for Parcel B and an indemnity agreement concerning a sewer lien on Parcel B.
Vile never authorized the change to the 10 Polaris Street property, and, until the closing, did not have maps with which he could have visualized the location of the parcels. The mylar maps which Driscoll gave to Vile at the closing (Pl. Exs. 6 and 7) do each illustrate Parcels A and B but they do not show the location of the house located on 10 Polaris Street. Further, Exhibit 7, which shows Parcel B, shows only the proposed subdivision street, Whittaker Lane, but does not show it in relation to Polaris Street or any identifying characteristics on the 10 Polaris Street lot. (Pl. Exs. 6 and 7.)
According to the testimony at the trial Schmidt first learned that the property description involved two pieces of land when he CT Page 8780 reviewed the description on the warranty deed at the closing. Vile attempted to explain to Schmidt what had happened, but was himself confused as to the location of Whittaker Lane which was shown on one of the two mylar maps. Vile asked if anyone knew where Whittaker Lane was and no one in the closing room knew. Attorney Driscoll did know about the subdivision but was sitting at the opposite end of the closing table and did not realize that there was a question concerning what had happened in the land swap. Driscoll never explained to Vile or Schmidt the nature of the land swap nor the location of Whittaker Lane or that the land swap had been for the purpose of a subdivision. Schmidt had to sign between 25 and 30 documents during the closing, which took one hour. There was also pressure on Schmidt to close because it was near the end of the month and his VA mortgage commitment was expiring. Several months later, Schmidt called McLaughlin and McLaughlin mailed him a map showing the location of Whittaker Lane. The following Spring, Schmidt became aware that the property on the north and east of 10 Polaris Street was going to be subdivided when neighbors informed him of McLaughlin's project. It was not until a surveyor began staking out Parcel A that Schmidt understood how the land swap was affecting his property. Thereafter, Cheryl Schmidt went to the Groton Land Records and it was then she and Schmidt discovered that the property description had been changed between the time of the contract and the time of the closing. Schmidt then called Vile and inquired into the matter. Vile had to call Driscoll to obtain copies of the mylar maps to answer Schmidt's questions. The plaintiff admits that he retained Vile to represent him in the purchase of the subject property. Likewise, there is no dispute that Vile was to examine the land records pertaining to the subject property (i.e. conduct a "title search") and represent the plaintiff at the closing. Vile's office arranged for the examination of the title of the subject property prior to the closing.
He was alerted to the existence of the land swap by deeds recorded more than three weeks in advance of the closing. Vile realized that he had not searched the title to the northeasterly triangle of land conveyed by Atlas to McLaughlin. He telephoned Driscoll, representing McLaughlin, and was assured by her that her offices had searched the title to the Atlas tract in connection with a subdivision, and that she would provide a certificate of title to the Atlas tract (Def. Ex. 5), and that McLaughlin would indemnify the plaintiff from the possibility that "Parcel B" would be subject to a sewer assessment against CT Page 8781 "20 Polaris Street", the street address assigned to the Atlas tract (Def. Exs. 6 and 7). Attorney Driscoll also advised Vile that she would bring maps to the closing to be recorded with the deeds, depicting the land which was the subject of the land swap. She brought those maps to the closing, and they were included among the closing documents.
The court finds that the existence of a planned subdivision road to be known as "Whittaker Lane" was known by and disclosed to Vile prior to the closing. The deed of conveyance and the mortgage deed itself describe "Whittaker Lane". Vile, as the plaintiff's attorney, knew about the planned street known as "Whittaker Lane" prior to the closing.
The court finds that the land swap and changed configuration of the subject property was disclosed to the plaintiff's attorney, Vile.
He testified that the existence of Whittaker Lane was disclosed by him to the plaintiff at the closing, that he offered the plaintiff an opportunity to postpone the closing to resolve any reservations which the plaintiff might have, and that the plaintiff, being aware of the existence of the planned roadway known as Whittaker Lane, nonetheless decided to proceed with and consummate the closing.
When the plaintiff learned of Whittaker Lane, he had an opportunity to postpone the closing and investigate the status of Whittaker Lane to his satisfaction. Vile testified that he told the plaintiff that the plaintiff had any doubts about going forward with the closing should not proceed. The plaintiff did not contradict this. There was no testimony that Vile insisted that the closing go forward, or that the plaintiff was required to sign the closing documents on that day. Instead, after being made aware of the existence of Whittaker Lane, and raising the issue of Whittaker Lane himself, the plaintiff chose to go forward with the closing and sign the mortgage deed which described the subject parcel as configured after the land swap.
It is settled law that, in these circumstances, the knowledge of Vile as the attorney and representative of the plaintiff is imputed to the plaintiff. "[T]he general rule is that the acts of an attorney are imputed to a client when they are performed in the furtherance of the business for which the attorney had been retained. Allen v. Nissley, 184 Conn. 539, 543 (1981). CT Page 8782
In addition to disclosure of the changed configuration of the subject property to Vile as the plaintiff's attorney, the plaintiff himself was made aware of the existence of Whittaker Lane. By his own testimony, he asked Vile about Whittaker Lane at the closing. Vile also recalls that the plaintiff inquired about Whittaker Lane, and that he went over the maps and deed descriptions, which depicted and referred to Whittaker Lane, with the plaintiff at the closing.
Accordingly, the court finds that the existence of Whittaker Lane was disclosed to the plaintiff, and the plaintiff had knowledge of Whittaker Lane.
The changed configuration of the subject property was a modification of the description of the property as set forth in the purchase and sale agreement. It is undisputed that there was no formal modification of the contract. This does not resolve the issue in favor of the plaintiff, however, because "[m]odification of a contract can be inferred from the attachment circumstances and conduct of the parties". Herbert S. Newman Partners v. CFCConstruction Ltd. Partnership, 236 Conn. 750, 762 (1996). The terms of the initial contract may be modified "by implication from the conduct of the parties". Miceli v. Helyer,40 Conn. App. 336, 343 (1996), quoting Malone v. Santora, 135 Conn. 286, 292
(1949).
A party entitled to demand strict performance of a contract term may waive performance of that term, and that this may be shown by acts evidencing that intent. Finlay v. Swirsky,103 Conn. 624, 635-6 (1925). Here, the silence and acquiescence of the plaintiff and his attorney, after disclosure of the changed configuration, constituted a waiver of the plaintiff's right to have the property conveyed by the original description. The plaintiff failed to object to the changed configuration. He also endorsed and accepted the changed configuration by executing the mortgage deed prepared by his own attorney which contained the changed configuration. The plaintiff cannot remain silent in circumstances that require objection and correction, and thereafter insist on compliance with a term he has waived by his conduct.
Waiver is the intentional relinquishment of a known right.Heyman Associates No 1 v. Insurance Co. of Pennsylvania,231 Conn. 756, 777 (1995). Waiver need not be express, but may CT Page 8783 consist of acts or conduct from which waiver may be implied.Novella v. Hartford Accident Indemnity Co., 163 Conn. 552, 562
(1972). "In other words, waiver may be inferred from the circumstances if it is reasonable so to do." Id. at 562. Here, the plaintiff knew of the terms of the initial contract regarding the description of the premises to be conveyed, yet failed to insist that the original description be followed. It is reasonable to conclude that the plaintiff waived whatever right he may have had to a conveyance by the original description.
The court has considered the arguments that there was no waiver of the plaintiff's rights because he was not aware of the change and, therefore, did not knowingly and intelligently waive those right. Since his attorney knew of the change before the closing and advised him of it, he had the opportunity to stop and make inquiries. His failure to do so when he had the opportunity does not suffice to defeat the defense of waiver.
The plaintiff also argues that the defendants failed to prove that the defense of equitable estoppel applies. He claims that the party to be estopped must say or do something to induce another to believe certain facts exist and to act on that belief and the other party, influenced thereby, must do some act to his injury which he otherwise would not have done. Novella, supra at 563. In this case, the plaintiff and his attorney with the closing. Acting in reliance on the plaintiff's silence, the defendant delivered the deed. The court finds that the defendants have proven the elements of equitable estoppel.
To the extent that the plaintiff considers himself to have been damaged by the possibility of a subdivision road near his property, the record reflects that he has received a sum of money from Vile in exchange for his withdrawal of his malpractice action against Vile. Specific performance is a form of equitable relief which resets on the sound discretion of the court Nann v.Pignatelli, 3 Conn. App. 74, 79 (1984). In the circumstances of this case, it would be inequitable to award specific performance to the plaintiff and force McLaughlin to revert to the original description when there has been disclosure of the changed configuration, knowledge of the changed configuration, a failure to object to the changed configuration and the receipt of money resulting from a claim based on the changed configuration.
The court, therefore, orders that judgment enter in favor of the defendant. CT Page 8784
D. Michael Hurley Judge Trial Referee