## HERBERT S. NEWMAN AND PARTNERS, P.C. *v.* CFC CONSTRUCTION LIMITED PARTNERSHIP ET AL.
### (15197)

Peters, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued February 13—officially released April 30, 1996

*Richard C. Robinson,* with whom, on the brief, was *Susan S. Chambers,* for the appellants (defendants).

*Thomas J. Shortell,* with whom, on the brief, was *Kerry R. Callahan,* for the appellee (plaintiff).

PETERS, C. J. The principal issue in this appeal is whether contracting parties who, pursuant to General Statutes § 49-41,[1] execute a public works construction

---

[1] General Statutes § 49-41 provides: "Public structures. Bonds for protection of employees and materialmen. (a) Each contract exceeding twenty-five thousand dollars in amount for the construction, alteration or repair of any public building or public work of the state or of any subdivision thereof shall include a provision that the person to perform the contract shall furnish to the state or the subdivision on or before the award date, a bond in the amount of the contract which shall be binding upon the award of the contract to that person, with a surety or sureties satisfactory to the officer awarding the contract, for the protection of persons supplying labor or materials in the prosecution of the work provided for in the contract for the use of each such person, provided no such bond shall be required to be furnished (1) in relation to any general bid in which the total estimated cost of labor and materials under the contract with respect to which such general bid is submitted is less than twenty-five thousand dollars, (2) in relation to any sub-bid in which the total estimated cost of labor and materials under the contract with respect to which such sub-bid is submitted is less than fifty thousand dollars, or (3) in relation to any general bid or sub-bid submitted by a design professional, as defined in section 4b-55. Any

payment bond may expand the coverage of the bond beyond the coverage required by the statute. The plaintiff, Herbert S. Newman and Partners, P.C., is an architectural firm that rendered services in connection with a public works project. The plaintiff brought an action against the defendants, CFC Construction Limited Partnership (CFC), which was the successor in interest to the general contractor on the public works project and the principal on the payment bond for the project, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), the surety on the bond. The plaintiff asserted a claim for damages against CFC for breach of contract and sought payment under the bond from both defendants for services it had rendered pursuant to the contract. The defendants denied the plaintiff's claim that it was owed compensation for services rendered. After a hearing, the trial court rendered judgment for the plaintiff. The defendants appealed jointly from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The following facts are undisputed. In 1986, Chase Enterprises authorized the plaintiff to begin rendering architectural services for the development of a design concept for a new city hall building in New Haven. On February 11, 1988, Enterprise Construction Company,

such bond furnished shall have as principal the name of the person awarded the contract.

"(b) Nothing in this section or sections 49-41a to 49-43, inclusive, shall be construed to limit the authority of any contracting officer to require a performance bond or other security in addition to the bond herein referred to, except that no such officer shall require a performance bond in relation to any general bid in which the total estimated cost of labor and materials under the contract with respect to which such general bid is submitted is less than twenty-five thousand dollars or in relation to any sub-bid in which the total estimated cost of labor and materials under the contract with respect to which such sub-bid is submitted is less than fifty thousand dollars."

Inc. (Enterprise), an entity affiliated with Chase Enterprises, entered into an owner-contractor agreement with the city of New Haven for the construction of the new city hall building. The owner-contractor agreement identified the plaintiff as the architect on the project.

CFC, another entity affiliated with Chase Enterprises, subsequently assumed Enterprise's obligations under the owner-contractor agreement. Pursuant to § 49-41, CFC furnished the city with a payment bond in the amount of $11,827,644. Under the terms of the payment bond, CFC, as principal, and National Union, as surety, bound themselves to make payments promptly to all claimants supplying labor, services or materials for the city hall project. The payment bond incorporated by reference the owner-contractor agreement and expressly provided that the bond was furnished pursuant to § 49-41. On July 13, 1989, the city consented to CFC's substitution as general contractor on the city hall project. On July 14, 1989, the city and CFC amended the owner-contractor agreement to reflect the assumption by CFC of Enterprise's obligations under the agreement.

On June 21, 1990, the city sent CFC a notification that it was terminating CFC's status as general contractor on the city hall project, effective seven days after CFC's receipt of the notification. On June 25, 1990, CFC received the city's notice of termination. On July 2, 1990, in accordance with the city's notice of termination, CFC relinquished control of the project to the city. Additional facts will be discussed as they become relevant to the issues before us.

On June 25, 1991, the plaintiff commenced this action against the defendants, seeking payment of its invoices, interest, costs and attorney's fees. The plaintiff's amended complaint alleged that CFC, as principal, and National Union, as surety, were liable to the plaintiff

under the terms of the payment bond for services that the plaintiff had rendered pursuant to its contract with CFC. The defendants denied that they owed the plaintiff compensation for those services, raised several special defenses to the plaintiff's claims and filed a counterclaim against the plaintiff for indemnity for any sums awarded against them in pending litigation.[2]

Specifically, the defendants claimed that the plaintiff was barred from recovering under its contract with CFC because, inter alia: (1) the plaintiff had failed to obtain a necessary contract modification for payment of the services for which it sought compensation; and (2) CFC's obligations under the contract had been discharged under the doctrine of accord and satisfaction. The defendants also claimed that, even if CFC were liable under its contract with the plaintiff, the plaintiff was not entitled to relief under the payment bond because: (1) the plaintiff had failed to establish that its services fell within the coverage of the bond; and (2) the plaintiff had failed to commence its action on the bond in a timely manner. The defendants further claimed that, even if the plaintiff could recover under the payment bond, the plaintiff was not entitled to recover under the bond for services that it had rendered after the city had terminated the owner-contractor agreement.

The trial court concluded that CFC had failed to perform its contract with the plaintiff. The trial court also concluded that the defendants were liable to the plaintiff on the payment bond for services that the plaintiff had rendered pursuant to its contract with CFC and for which it had not received compensation. The trial court

---

[2] The defendants' amended answer alleged that the city had asserted claims against CFC for untimely performance on the city hall project. The answer further alleged that the plaintiff was liable to CFC for indemnity in that litigation because the plaintiff's failure to perform or, in the alternative, negligent performance had caused any untimely performance by CFC.

rendered judgment for the plaintiff on both the complaint and the counterclaim, and awarded the plaintiff $184,793.02, plus costs and interest.

## I

The defendants' primary claim is that the work performed by the plaintiff is not covered by the payment bond that CFC furnished for the city hall project. The defendants contend that, as a matter of law, the coverage of a payment bond executed pursuant to § 49-41 cannot be broader than the coverage required by the statute, and that the statute expressly protects only "persons supplying labor or materials." The defendants further contend that the plaintiff can recover on the payment bond as a "[person] supplying labor or materials" only for services that it rendered on the project job site and that, because the plaintiff did not distinguish between services it had rendered at the job site and services it had rendered away from the job site, it failed to establish its entitlement to recovery on the bond. We need not determine whether the defendants' interpretation of § 49-41 is correct, however, because we conclude that the coverage of a payment bond executed pursuant to § 49-41 can be broader than the coverage required by the statute and that in this case the bond executed by the defendants expressly covered the services rendered by the plaintiff.

We first address the defendants' claim that a payment bond executed pursuant to § 49-41 cannot establish broader protection than that required by the statute. Our analysis of this issue "is guided by well established principles of statutory construction. Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history

and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *HUD/Barbour-Waverly* v. *Wilson*, 235 Conn. 650, 656, 668 A.2d 1309 (1995).

"As with any issue of statutory interpretation, our initial guide is the language of the statute itself." *HUD/ Barbour-Waverly* v. *Wilson*, supra, 235 Conn. 656; see *Frillici* v. *Westport*, 231 Conn. 418, 430, 650 A.2d 557 (1994). Section 49-41 sets forth the requirements for a public works construction payment bond. We have consistently recognized that the provisions of § 49-41 are to be incorporated into a payment bond that is executed pursuant to the statute. See *American Masons' Supply Co.* v. *F. W. Brown Co.*, 174 Conn. 219, 225, 384 A.2d 378 (1978); *International Harvester Co.* v. *L. G. DeFelice & Son, Inc.*, 151 Conn. 325, 333, 197 A.2d 638 (1964); *New Britain Lumber Co.* v. *American Surety Co.*, 113 Conn. 1, 5, 154 A. 147 (1931). In accordance with the plain and unambiguous language of § 49-41, however, the coverage of a payment bond need not be limited to the coverage required by the statute. With exceptions not at issue in this case, § 49-41 (b) provides that "[n]othing in this section or sections 49-41a to 49-43, inclusive, shall be construed to limit the authority of any contracting officer to require a performance bond or other security *in addition to the bond herein referred to . . . .*" (Emphasis added.) Thus, § 49-41 expressly contemplates that the parties to a payment bond, although they must provide the coverage required by the statute, may incorporate additional provisions that expand the coverage required by the statute. See *New Britain Lumber Co.* v. *American Surety Co.*, supra, 6–7.

The legislative purpose in enacting § 49-41 supports the conclusion that a payment bond executed pursuant to § 49-41 may provide protection that is broader than that required by the statute. Section 49-41 is a remedial statute enacted to protect workers and materials suppliers on public works projects who cannot avail themselves of otherwise available remedies such as mechanic's liens. See *Okee Industries, Inc.* v. *National Grange Mutual Ins. Co.*, 225 Conn. 367, 373, 623 A.2d 483 (1993); *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 477–79, 542 A.2d 692 (1988); *Pelton & King, Inc.* v. *Bethlehem*, 109 Conn. 547, 556, 147 A. 144 (1929). The statute's provisions are to be liberally construed to effect its remedial purpose. *Okee Industries, Inc.* v. *National Grange Mutual Ins. Co.*, supra, 373; *International Harvester Co.* v. *L. G. DeFelice & Son, Inc.*, supra, 151 Conn. 333. The construction of § 49-41 proffered by the defendants, which would limit payment bond coverage for those parties whom § 49-41 was enacted to protect to the coverage expressly required by the statute, would frustrate the very purpose that the statute was designed to further.

Moreover, federal precedents reflect the principle that statutory requirements establish only a floor of protection beneath which the coverage of a payment bond cannot fall, rather than an upper limit upon the scope of a bond's coverage. Because § 49-41 was patterned after and operates in general conformity with federal legislation popularly known as the Miller Act; 40 U.S.C. §§ 270a through 270e; "we have regularly consulted federal precedents to determine the proper scope of our statute." *Okee Industries, Inc.* v. *National Grange Mutual Ins. Co.*, supra, 225 Conn. 374; see *O & G Industries, Inc.* v. *New Milford*, 229 Conn. 303, 309, 640 A.2d 110 (1994); *American Masons' Supply Co.* v. *F. W. Brown Co.*, supra, 174 Conn. 223–24. As the United States Supreme Court observed in *United States* v. *Car-*

*ter*, 353 U.S. 210, 215–16, 77 S. Ct. 793, 1 L. Ed. 2d 776 (1957), "liability on a Miller Act bond must be *at least* coextensive with the obligations imposed by the Act if the bond is to have its intended effect." (Emphasis added.)

Thus, in light of the plain language of § 49-41, the purposes underlying the statute, and the United States Supreme Court's construction of the Miller Act, we are persuaded that contracting parties who execute a payment bond pursuant to § 49-41 have the authority to expand coverage beyond that required by the statute. Accordingly, we must examine the terms of the payment bond executed by the defendants in this case in order to ascertain the extent of protection afforded therein to the plaintiff.

The payment bond that CFC furnished for the city hall project provided in relevant part: "Any party, whether a subcontractor or otherwise, *who furnishes materials or supplies or performs labor or services* in the prosecution of the work under said contract, and who is not paid therefor, may bring a suit on this bond in the name of the person suing, prosecute the same to a final judgment, and have execution thereon for such sum or sums as may be justly due." (Emphasis added.) By including services as well as labor, without limitation to where the services were to be rendered, the terms of the payment bond afforded protection for the services rendered by the plaintiff. We conclude, therefore, that the payment bond's explicit language permits the plaintiff to recover under the bond for the architectural services it rendered.[3]

---

[3] Because the terms of the payment bond executed by the defendants expressly extended the bond's protection to services without restricting the location of performance, we need not decide in this case whether, as the defendants assert, the statutory protection for "persons supplying labor or materials" in § 49-41 (a) encompasses only those persons who render professional services at a project site.

The defendants claim, however, that other language, elsewhere in the payment bond, restricts the bond's coverage to that required by § 49-41. The defendants focus on the following provision of the payment bond: "NOW, THEREFORE, the condition of this obligation is such that, if the said Principal shall promptly pay for all materials furnished and labor supplied or performed in the prosecution of the work included in and under the aforesaid contract, whether or not the material or labor enters into and becomes a component part of the real asset, then this obligation shall be null and void, otherwise it shall remain and be in full force and effect." We agree with the plaintiff that, at most, this provision, when read together with the other provisions of the payment bond, raises an ambiguity concerning the scope of the bond's coverage. "Since the bond was furnished by the defendants, it must be interpreted most strongly against them." *Brookfield* v. *Greenridge, Inc.*, 177 Conn. 527, 535, 418 A.2d 907 (1979); see *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 231, 571 A.2d 112 (1990); *Hartford Electric Applicators of Thermalux, Inc.* v. *Alden*, 169 Conn. 177, 182, 363 A.2d 135 (1975). In accordance with this rule of construction, we construe the payment bond's "labor or services" provision as the controlling coverage provision in the bond. The architectural services rendered by the plaintiff, therefore, fall within the scope of the payment bond's coverage.

Although the defendants could have limited the coverage of the payment bond to the terms set forth in § 49-41, they did not do so. "[I]n private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability." *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 756, 628 A.2d 1298

(1993); see *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 377, 321 A.2d 444 (1973). The defendants are knowledgeable and commercially sophisticated parties. They do not claim that there were improprieties in the contract formation process. In the absence of any other countervailing policy reason, they are bound by the express terms of the payment bond that they themselves drafted and executed. It is axiomatic that courts do not rewrite contracts for the parties. *Heyman* v. *CBS, Inc.*, 178 Conn. 215, 227, 423 A.2d 887 (1979); see *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 159, 595 A.2d 872 (1991); *Jay Realty, Inc.* v. *Ahearn Development Corp.*, 189 Conn. 52, 55, 453 A.2d 771 (1983). Accordingly, we will give effect to the payment bond's express terms, which extend protection on the bond to those parties, such as the plaintiff, who "perform[ed] labor or services in the prosecution of the work under" the owner-contractor agreement.

## II

The defendants have raised several additional claims challenging the liability of CFC under its contract with the plaintiff and the liability of both defendants on the payment bond. The trial court rejected each of these other claims and concluded that the plaintiff was entitled to relief under the contract and on the payment bond. We are not persuaded by any of the defendants' arguments to the contrary.[4]

## A

The defendants claim that the trial court improperly concluded that CFC had failed to perform its contract

---

[4] The order in which we address the various remaining issues raised in this appeal is not the order in which the parties addressed the issues. If CFC had no contractual obligation to the plaintiff, however, the plaintiff would not be entitled to compensation under the payment bond. See *American Oil Co.* v. *Valenti*, 179 Conn. 349, 352–53, 426 A.2d 305 (1979); *Murphy* v. *Schwaner*, 84 Conn. 420, 425, 80 A. 295 (1911). Accordingly, we address the defendants' claims based on the contract between the plaintiff and

with the plaintiff.[5] Specifically, the defendants contend that payment for the services for which the plaintiff sought compensation required a modification of the contract. The defendants further contend that because CFC and the plaintiff had never modified the contract, CFC never became obligated to pay the plaintiff for those services. We are unpersuaded.

The following additional facts are relevant to this issue. The plaintiff seeks compensation for services defined in the contract as "project representation beyond basic services." The contract specified that the plaintiff and CFC were required to modify the contract before such services would be compensable. On June 30, 1988, CFC acceded to the plaintiff's request for compensation for project representation beyond basic services, and the parties agreed that the plaintiff's invoices for such services would not exceed $6000 per month.

Subsequent to the June 30, 1988 modification, however, the plaintiff's monthly invoices for project representation beyond basic services consistently exceeded $6000. CFC consistently paid these invoices without protest until the beginning of 1990. The trial court found that the plaintiff's billing and CFC's payment in excess of the $6000 per month spending cap constituted a valid modification that abrogated the spending cap. We agree with the trial court.

For a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties "must assent to the same

CFC before we address the defendants' remaining claims based on the payment bond.

[5] The plaintiff and CFC never fully executed an agreement for architectural services. The parties did, however, adopt as their contract the proposed architectural services agreement that the plaintiff had sent to Chase Enterprises on June 30, 1988, and both the plaintiff and CFC performed their obligations pursuant to the terms of that agreement. The defendants do not dispute that a valid contract existed between the plaintiff and CFC.

thing in the same sense." (Internal quotation marks omitted.) *Lar-Rob Bus Corp.* v. *Fairfield*, 170 Conn. 397, 402, 365 A.2d 1086 (1976); see *First Hartford Realty Corp.* v. *Ellis*, 181 Conn. 25, 33, 434 A.2d 314 (1980). Modification of a contract may be inferred from the attendant circumstances and conduct of the parties. See *Rowe* v. *Cormier*, 189 Conn. 371, 372–73, 456 A.2d 277 (1983); *Malone* v. *Santora*, 135 Conn. 286, 292, 64 A.2d 51 (1949).

Whether the parties to a contract intended to modify the contract is a question of fact. *Three S. Development Co.* v. *Santore*, 193 Conn. 174, 177–78, 474 A.2d 795 (1984); *Rowe* v. *Cormier*, supra, 189 Conn. 373. "The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witness." (Citations omitted; internal quotation marks omitted.) *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, supra, 207 Conn. 473.

Upon review of the entire record, we can find no reason to disturb the trial court's finding that the plaintiff and CFC modified, through their course of conduct, the June 30, 1988 agreement. The trial court's factual findings and ultimate conclusion are adequately supported by the record and are not clearly erroneous. Practice Book § 4061; see *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). Accordingly, the condition precedent to CFC's payment obligations under the contract occurred, and CFC's subsequent failure to satisfy its obligations constituted a breach of contract.

## B

The defendants also claim that the trial court improperly determined that the plaintiff and CFC had not exe-

cuted an accord that effectively discharged CFC's obligations under its contract with the plaintiff. We agree with the trial court that the defendants failed to establish the existence of a valid accord.

The following additional facts are relevant to this issue. Beginning in early 1990, CFC disputed the plaintiff's claims for compensation for architectural services and refused to pay the plaintiff's invoices. The parties subsequently negotiated with one another in an attempt to resolve their disagreement over the plaintiff's compensation. On March 27, 1990, the plaintiff agreed to accept and CFC agreed to pay $200,000 to settle their dispute.

On April 6, 1990, CFC tendered to the plaintiff a $100,000 check, which represented the first of three payments. A letter that accompanied the check stated that the remaining $100,000 due the plaintiff pursuant to the parties' March 27, 1990 agreement would be paid in two installments of $50,000 each. The letter stated that CFC would pay the first $50,000 at the end of April, 1990, and the second $50,000 "upon substantial completion of the [city hall] project." CFC believed that the $200,000 payment would compensate the plaintiff for future services as well as for all outstanding invoices. The plaintiff cashed the $100,000 check. On April 12, 1990, the plaintiff wrote a letter to CFC, notifying it that the letter that had accompanied the $100,000 payment had inaccurately described the March 27, 1990 agreement. According to the plaintiff's letter, the second $50,000 payment was due on May 28, 1990, rather than, as CFC had claimed, upon substantial completion of the project. The plaintiff's letter also disputed CFC's calculation of the amount that it had paid the plaintiff for architectural services. The parties subsequently communicated with one another, but never resolved these issues.

In early May, 1990, CFC tendered, and the plaintiff accepted, the first $50,000 payment. CFC never tendered the second $50,000 payment. When CFC failed to pay the second $50,000 according to the plaintiff's understanding of the March 27, 1990 agreement, the plaintiff credited the $150,000 that it had received against CFC's outstanding balance and resumed its prior billing process.

"When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim." *County Fire Door Corp.* v. *C. F. Wooding Co.*, 202 Conn. 277, 281, 520 A.2d 1028 (1987). "An accord is a contract between creditor and debtor for the settlement of a claim by some performance other than that which is due. Satisfaction takes place when the accord is executed." *W. H. McCune, Inc.* v. *Revzon,* 151 Conn. 107, 109, 193 A.2d 601 (1963). Without a mutual assent, or a "meeting of the minds," there cannot be a valid accord. *Crucible Steel Co.* v. *Premier Mfg. Co.*, 94 Conn. 652, 656, 110 A. 52 (1920).

The trial court found that there had been no mutual assent between the plaintiff and CFC in the discussions that had led to the March 27, 1990 purported settlement agreement, and therefore concluded that the parties had not entered into a valid accord. The trial court's finding is amply supported by the evidence, which established that the parties had disputed the terms of the settlement agreement. The letter sent by the plaintiff in response to CFC's letter that accompanied its $100,000 payment recited a disagreement as to the timing of the second $50,000 payment, and a further disagreement as to the compensation that CFC had previously paid the plaintiff. In light of this evidence, the trial court's finding that there was no mutual assent

between the parties, a necessary predicate for the existence of a valid accord, was not clearly erroneous.

The defendants claim that, even if the plaintiff and CFC did not execute a valid accord on March 27, 1990, the plaintiff's subsequent cashing of the $100,000 check constituted an acceptance of the terms contained in the letter that accompanied the check. We disagree. If a creditor knowingly cashes or otherwise exercises full dominion over a check explicitly tendered in full satisfaction of an unliquidated debt, the creditor cannot disown any conditions upon which the check has been tendered. *County Fire Door Corp.* v. *C. F. Wooding Co.*, supra, 202 Conn. 281, 291–92; see General Statutes § 42a-3-311.[6] In this case, however, the $100,000 check

[6] General Statutes § 42a-3-311 provides: "Accord and satisfaction by use of instrument. (a) If a person against whom a claim is asserted proves that (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument, the following subsections apply.

"(b) Unless subsection (c) applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

"(c) Subject to subsection (d), a claim is not discharged under subsection (b) if either of the following applies:

"(1) The claimant, if an organization, proves that (i) within a reasonable time before the tender, the claimant sent a conspicuous statement to the person against whom the claim is asserted that communications concerning disputed debts, including an instrument tendered as full satisfaction of a debt, are to be sent to a designated person, office, or place, and (ii) the instrument or accompanying communication was not received by that designated person, office, or place.

"(2) The claimant, whether or not an organization, proves that within ninety days after payment of the instrument, the claimant tendered repayment of the amount of the instrument to the person against whom the claim is asserted. This paragraph does not apply if the claimant is an organization that sent a statement complying with paragraph (1) (i).

"(d) A claim is discharged if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim."

was neither tendered in full satisfaction of CFC's debt to the plaintiff nor tendered on condition of the terms contained in the letter that accompanied the check. The $100,000 check, by CFC's own admission, was tendered as a partial payment of the debt owed to the plaintiff. Moreover, the letter that accompanied the check merely stated CFC's understanding of the parties' purported settlement agreement, and neither the letter nor the check conditioned acceptance of the check on the terms contained in the letter. Because conditions necessary for a valid accord have not occurred, the defendants' claim of accord and satisfaction premised on the plaintiff's cashing of the $100,000 check must fail.

C

The defendants further claim that, even if the services rendered by the plaintiff fall within the scope of the payment bond, the trial court improperly found that the plaintiff had commenced its action on the bond within the one year time limitation prescribed by General Statutes § 49-42 (b).[7] We are unpersuaded.

Section 49-42 (b) requires a claimant to commence a suit on a payment bond within one year of the day that the claimant last performed work or supplied materials on the bonded project. See footnote 7; see also *American Masons' Supply Co.* v. *F. W. Brown Co.*, supra, 174 Conn. 222. The plaintiff commenced its action on June 25, 1991, the date on which it caused

---

[7] General Statutes § 49-42 provides in relevant part: "Enforcement of right to payment on bond. Suit on bond, procedure and judgment. . . .

"(b) Every suit instituted under this section shall be brought in the name of the person suing, in the superior court for the judicial district where the contract was to be performed, irrespective of the amount in controversy in the suit, but no such suit may be commenced after the expiration of one year after the applicable payment date provided for in subsection (a) of section 49-41a, or, in the case of a person supplying materials or performing subcontracting work not included on a requisition or estimate, no such suit may be commenced after the expiration of one year after the date such materials were supplied or such work was performed."

its complaint to be served on each of the defendants. *Rana* v. *Ritacco*, 236 Conn. 330, 337, 672 A.2d 946 (1996) (action commenced when process served on defendant). The trial court found that the plaintiff had rendered necessary services on the city hall project pursuant to its contract with CFC within one year of this date. The trial court's findings are supported by the testimony of Rai Muhlbauer, an employee of the plaintiff who worked on the city hall project. Muhlbauer testified that on June 25, 1990, prior to the effective termination date of the owner-contractor agreement, he had performed various tasks at the project job site pursuant to the owner-contractor agreement. The trial court credited Muhlbauer's testimony. Although the defendants contend that the testimony of another employee of the plaintiff established that the plaintiff had not been working pursuant to the owner-contractor agreement after June 21, 1990, this court cannot retry the facts or pass on the credibility of witnesses. *Holy Trinity Church of God in Christ* v. *Aetna Casualty & Surety Co.*, 214 Conn. 216, 223, 571 A.2d 107 (1990); *Kimberly-Clark Corp.* v. *Dubno*, 204 Conn. 137, 153, 527 A.2d 679 (1987).

In light of the trial court's findings, which have not been shown to be clearly erroneous, the plaintiff worked on the city hall project, pursuant to the owner-contractor agreement and to its contract with CFC, within one year of the commencement of its action against the defendants. Accordingly, the plaintiff timely commenced its action against the defendants for compensation under the payment bond.

### D

Lastly, the defendants claim that, even if they are liable on the payment bond, the plaintiff is not entitled to recover on the bond for services that it rendered after the owner-contractor agreement had terminated on July 2, 1990. The defendants contend that when

the city terminated the owner-contractor agreement, services subsequently rendered by the plaintiff on the city hall project were outside of that agreement. The trial court determined that the defendants were estopped from raising this claim. We agree with the trial court.

The following additional facts are relevant to this issue. Both defendants protested the city's termination of CFC as general contractor on the city hall project. The defendants also informed the city and the plaintiff that the city's termination of the owner-contractor agreement had no legal effect. Subsequent to CFC's receipt of the city's notice of termination, CFC directed the plaintiff to continue working on the project pursuant to the owner-contractor agreement.

It is well established that any recovery premised on estoppel must be supported by proof of two essential elements: (1) the party against whom estoppel is claimed must be shown to have done or said something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and (2) the other party must be shown to have changed its position in reliance on those facts, thereby incurring some injury. *Lunn* v. *Tokeneke Assn., Inc.*, 227 Conn. 601, 607, 630 A.2d 1335 (1993); *O'Sullivan* v. *Bergenty*, 214 Conn. 641, 648, 573 A.2d 729 (1990). An estoppel is predicated on proof of misleading conduct resulting in prejudice to the other party. *John F. Epina Realty, Inc.* v. *Space Realty, Inc.*, 194 Conn. 71, 85, 480 A.2d 499 (1984). The party claiming estoppel has the burden of proof, and whether it has met that burden in a particular case is an issue of fact. *Middlesex Mutual Assurance Co.* v. *Walsh*, 218 Conn. 681, 699, 590 A.2d 957 (1991).

The trial court found that the defendants, through their conduct, had induced the plaintiff to continue working on the city hall project. The trial court also

found that the plaintiff, on the basis of the defendants' conduct, had continued to render services pursuant to the owner-contractor agreement after CFC's status as general contractor had terminated on July 2, 1990, and that the plaintiff had been injured thereby. In light of these findings, which the defendants have not demonstrated to be clearly erroneous, the trial court properly determined that the defendants were estopped from denying payment for work performed by the plaintiff after July 2, 1990. The plaintiff, therefore, was entitled to recover on the payment bond for services that it rendered after the city had terminated the owner-contractor agreement.

The judgment is affirmed.

In this opinion the other justices concurred.