[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case was decided from the bench by the court on May 8, 2001. Since an appeal has been filed, the court elects to comply with Practice Book § 64-1(a) by issuing this memorandum of decision.
In August of 1998, this case was brought by Vincent and Sandra Douthwright against two defendants, Northeast Corridor Foundations and New England Pipe Corporation. Plaintiff's claimed damages for serious personal injuries sustained by Mr. Douthwright when heavy pipes rolled off a truck at a construction site and crushed Mr. Douthwright's leg. An intervening plaintiff, the employer of Mr. Douthwright who paid considerable worker's compensation, came into the case. Defendant New England Pipe Corporation filed a counterclaim against the intervening plaintiff on which counterclaim the court granted summary judgment for the intervening plaintiff in November of 2000.
In December of 2000, the parties attempted to mediate the matter. All counsel were present at the mediation which occurred on two separate days in December of 2000, with Attorney Dale Faulkner serving as the mediator. As a result of the mediation all parties were agreed that plaintiff would receive $3.2 million. That sum was to be paid $700,000.00 from New England Pipe Corporation and $2.5 million from Northeast Corridor Foundations. The $2.5 million was to be paid $1 million by the primary insurer and $1.5 million by the excess carrier. Each of Northeast's carriers had separate counsel at the mediation, although counsel for the excess carrier had not filed an appearance in this action at the time of the mediation. In addition, the defendants agreed between themselves to arbitrate the issue of their comparative responsibility, but plaintiff was not a part of or party to that agreement.
Counsel for plaintiff provided the necessary releases and withdrawals to counsel for defendants in early January. Thirty days after those CT Page 11941 documents were provided (February 2, 2001) the excess carrier failed to pay its $1.5 million share of the settlement, thus triggering the interest provisions of C.G.C. § 52-195c.
After the mediation, counsel for the excess carrier, Attorney Mark Seiger of the firm of Edwards Angell took the position that the settlement was contingent on the signing of an arbitration agreement between Northeast Corridor Foundations and New England Pipe Corporation dealing with issues existing between them as to the appropriate share of liability.
There is little doubt that counsel for New England Pipe Corporation and counsel for Northeast Corridor Foundations did agree at the mediation to arbitrate their share of liability, and when Attorney Seiger submitted a draft of a proposed arbitration agreement he included provisions for a single arbitrator, for arbitrating the active-passive negligence issues which had previously been foreclosed in the litigation, and for providing only, limited discovery prior to the arbitration. Those terms were not acceptable to counsel for New England Pipe Corporation. Although the underlying carrier for Northeast paid its million dollars, the carrier for New England Pipe paid its $700,000.00, Attorney Seiger refused to pay the $1.5 million until the "pre-condition" as he phrased it, was satisfied.
Plaintiffs' counsel moved for default judgment in accordance with § 52-195c of the Connecticut General Statutes with interest as provided for by that statute. The parties appeared on March 26, 2001 at which time Attorney Mark Seiger was not present, but Attorney Joshua Milrad from the same firm was present. Attorney Milrad indicated that the arbitration agreement had been signed and received by his office on the previous Friday, and indicated that a check for the $1.5 million could be cut within seven days or so. However, counsel for plaintiff indicated that while certainly the $1.5 million was due and payable, there was also the issue of 12% interest for failure of the defendant to pay $1.5 million within 30 days of the plaintiffs providing the necessary paperwork. By all accounts, that date was February 2, 2001. Apparently, in March of 2001 Attorney Faulkner was in Florida for a number of weeks, and Attorney Milrad reported that Attorney Seiger was sure that Attorney Faulkner would have a clear memory of this situation and all parties expressed hope that upon Mr. Faulkner's return that the matter could be resolved but if that was not to be the case the parties would request scheduling for an evidentiary hearing.
On May 3rd that hearing was held and concluded on May 8th, testimony not having been completed on the half day allocated by the court on the afternoon of May 3rd. At the evidentiary hearing counsel CT Page 11942 for the underlying insurance carrier for Northeast Corridor Foundations, counsel for New England Pipe Corporation, counsel for the intervening plaintiff, counsel for the plaintiff and the mediator himself, Attorney Dale Faulkner, testified as did Attorney Mark Seiger. Everyone with the exception of Mr. Seiger, was in agreement that there was a full and complete settlement in December of 2000 in which the previously stated sums of money would be paid by the previously listed carriers to the plaintiff. There was also an agreement, to which plaintiff was not privy, that the defendants would arbitrate the issue of their comparative responsibility but all the witnesses were quite clear that the signing of such an arbitration agreement was not a pre-condition to the obligation to make payment to plaintiff. The court notes that this is a very sensible approach to settlement of the underlying action, since at trial it would be likely that each defendant would be attempting to cast blame on the other defendant since it seemed unlikely that anyone was going to dispute that the injuries to Mr. Douthwright were caused as he claimed. Thus the settlement of the case permitted arbitration as to comparative responsibility without running the risk of a jury verdict in excess of the settlement amount.
The proposed arbitration agreement drafted by Mr. Seiger was never signed. The eventual resolution of the arbitration agreement issue was that the parties signed an agreement for arbitration with three arbitrators, the usual amount of discovery before arbitration and the arbitration being limited to comparative liability without the active-passive issues that had been previously precluded in the litigation.
Thus, Mr. Seiger's desires to change the agreement of December 2000 were ultimately unsuccessful and the two defendants signed the arbitration agreement on March 23, 2001.
It is clear to the court that the claims manager for the insurance company which hired Mr. Seiger has been difficult and it is clear to the court that Mr. Seiger has managed to convince himself that there was no agreement in December of 2000. The court finds Mr. Seiger's testimony to be not credible. It is obvious to the court that Mr. Seiger has rationalized his difficulties with his client by unconsciously altering his memory of what all of the other witnesses, each an eminent practitioner and thoroughly credible, recall so clearly. Essentially, Attorney Seiger's position has been that if he didn't agree therefore there could not have been a meeting of the minds and that oversimplification of the law of contracts is rejected by the court. The court finds that a clear and unequivocal agreement to settle the case for $3.2 million was reached in December 2000 and that interest ran from February 2, 2001, a period of time 30 days after plaintiff's counsel had CT Page 11943 prepared all of the necessary documentation such as releases and withdrawals and had them delivered to counsel for the defendants.
Although the court does not so find, if Mr. Seiger's position were to be found to be factually true, it still can not prevail. As former Chief Justice Peters recently opined. . . . "The plaintiff attaches great significance to postagreement discussions about the springback guarantees. We do not doubt that acceptable guarantees were essential features of the refinancing agreement, but we disagree that these guarantees were too indefinite to be enforceable.
"Our contract law is not as constricted as the plaintiff assumes it to be. The plaintiff assumes that a court is precluded from finding the existence of an enforceable agreement if (1) the parties engaged in further negotiations subsequent to the time of the agreement or (2) the essential terms of the agreement have not been fully spelled out at the time of the agreement. We are not persuaded.
"The fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings ripen into an enforceable agreement. The plaintiff cites no authority, and we have found none, that assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together. We know of no authority that precludes contracting parties from engaging in subsequent negotiations to clarify' or to modify, the agreement that they had earlier reached." WillowFunding Co., L.P. v. Grencom Assoc., 63 Conn. App. 832, ___ A.2d ___ (2001).
After the first appearance on plaintiffs' motion for default judgment in March of 2001, at which Mr. Milrad indicated the defendants' willingness to send the $1.5 million along within seven days, nothing of significance occurred except that Attorney Faulkner wrote a letter indicating his recollection that there was a clear agreement in December of 2000. Plaintiffs' counsel then wrote to Mr. Seiger asking what Mr. Seiger wished to do, either pay the money that was owed or have an evidentiary hearing on the factual issues. Attorney Seiger was now in the untenable position of being in receipt of Attorney Faulkner's letter and realizing that, even if he succeeded in defeating plaintiffs' claim for interest under the statute based on his "precondition" theory, that interest would begin to run even under his theory 30 days from March 23, 2001. He therefore caused a letter to be sent with a $1.5 million check to the plaintiffs' attorney. At the hearing, Mr. Seiger expressed surprise that plaintiffs' attorney had deposited the $1.5 million check and claimed accord and satisfaction. CT Page 11944
As to the last minute claim of accord and satisfaction, the court finds that this claim is without merit for the reason that the letter accompanying the $1.5 million check (which check did not itself have a restrictive endorsement) was nothing more than a letter indicating that the check was forwarded in settlement of the underlying claim of Mr. Douthwright against Northeast. The court again expressly declines to credit Mr. Seiger's convenient testimony as to his intent.
"An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Upon acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt and bars any further claim elating thereto, if the contract is supported by consideration." BB Bail BondsAgency of Conn., Inc. v. Bailey, 256 Conn. 209, 770 A.2d 960 (2001).
"When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. . . . An accord is a contract between a creditor and debtor for the settlement of a claim by some performance other than that which is due . . . Without a mutual assent, or a `meeting of the minds', there cannot be a valid accord." (Citations omitted; internal quotation marks omitted.) Herbert S. Newman Partners, P.C. v. CFC Construction Ltd.Partnership, 236 Conn. 750, 764, 674 A.2d 1313 (1996).
"To prove an accord and satisfaction, the defendant must show that at the time of the agreement there was a good faith dispute over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim. The accord must be a new agreement based on new consideration. . . . The proponent must be able to show that there was a meeting of the minds, and that the offer by the debtor was clearly tendered as full satisfaction of the debt and that the payment was knowingly accepted." (Citations omitted.) Munroev. Emhart Corporation, 46 Conn. App. 37, 42, 699 A.2d 213 (1997).
Further the court finds that since the $1.5 million was already owed when it was paid, according to everyone's testimony, including Mr. Seiger's, there could not have been any consideration for the alleged accord and satisfaction.
The court further notes discrepancies between Mr. Seiger's testimony under oath in open court and his affidavit (of course, also under oath) filed initially with his papers in opposition to plaintiff's motion. It is regrettable indeed for the court to have to point out in such excruciating detail the sad result that occurs when a lawyer permits him or herself to become so personally involved in a matter that not only is CT Page 11945 objectivity lost, but unfortunately, as is the case here, the operation of wishful thinking and desperate rationalization produce seriously flawed recollections.
For the foregoing reasons judgment will enter as of May 8, 2001 in the amount of $40,931.45. That amount is calculated for 83 days of interest at a per diem rate of $493.15. Interest is calculated from February 2, 2001 through April 25, 2001, the date on which plaintiff finally received the $1.5 million check.
Koletsky, J.