[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This an action brought for the purpose of defining the legal relationship between the University of Hartford (the "University") and the Hartford Art School, Inc. ("HAS, Inc."). By way of a six count complaint, HAS, Inc. seeks a declaratory judgment that it holds legal title to the Hartford Art School Endowment (the "endowment") as it existed in 1960 and as it exists today [Count I], and a declaration that it is the sole governing body of the Hartford Art School [Count VI]. HAS, Inc. also seeks a declaration that the University may not show the endowment on its consolidated balance sheet [Count II]. HAS, Inc. asserts CT Page 163 additional claims against the University for breach of fiduciary duty [Count IV] and conversion [Count V], and HAS, Inc. seeks an itemized accounting of the endowment from the University for the period of 1960 to the present [Count III]. By way of special defense, the University claims that the plaintiffs complaint fails to state a claim upon which relief can be granted, that the plaintiffs claims are barred by laches, waiver, estoppel, the doctine of unclean hands and the applicable statutes of limitations. By way of counterclaim, the University seeks a declaratory judgment that it owns the endowment [Count I]. In the alternative, the University seeks an order transferring the post-1960 endowment to the University [Count II]. The University also seeks a declaration that it has exclusive control over the Art School and that the role of HAS, Inc. is limited to specific delegations by the University's Board of Regents [Count III]. The University further claims that HAS, Inc. has breached the 1960 Agreement, for which it seeks damages [Count IV]. By way of special defense, HAS, Inc. claims that the University's counterclaim fails to state a claim upon which relief may be granted, that it is barred by laches, waiver and estoppel.
As an educational institution, the Hartford art School has existed since the latter part of the 19th century. Formed originally as a decorative art society, it evolved into a freestanding educational facility devoted to the teaching of fine arts and governed by its Board of Trustees, comprised largely of generous benefactors of the arts.
In 1957, the Connecticut General Assembly authorized the formation of the University of Hartford to be composed of one or more institutions of learning. The 1957 Public Act ("The Act") identified Hillyer College, the Julius Hartt Musical Foundation, Inc. ("Hartt, Inc."), and HAS, Inc. as the institutions of learning initially joining the University. The Act vested in a Board of Regents the care, control, and disposition of the property and funds of the University and the general management of its affairs, including the power to adopt by-laws. The Act allowed these entities to "maintain separate corporate structures until such time as their governing bodies shall determine otherwise."
In 1960, the University entered into an agreement with Hillyer College, Hartt, Inc., and HAS, Inc. which defined the relationship of the University of Hartford and the three member institutions as follows:
 ". . . hereby agree to join the University and to be subject to the control of the University, as may from time to time be exercised through its Board of Regents, except as to specific acts and duties as may be delegated by the Board of Regents to the Board of Trustees of the Member Institutions. In accordance CT Page 164 with the Special Act incorporating the University on February 21, 1957, the Member Institutions are maintaining their separate corporate structures until such time as their governing bodies shall determine otherwise."
The 1960 Agreement further provided:
 "All right, title and interest to all property, funds and assets, including income and fees from all sources of the Member Institutions, both real and personal, wheresoever situated, now held or subsequently acquired, is hereby assigned, conveyed, transferred and delivered to the University, provided, however, that all restricted funds of the Member Institutions shall be held by the University as hereinafter provided, and, further, provided that restricted endowment funds of the Hartford Art School which have not been at the time of the signing of this agreement transferred to the University, shall be transferred to the University and held by the University as hereinafter provided, when an appropriate judicial order authorizing such action is granted, or, in the absence of such judicial order, an opinion of counsel to the effect that such transfer is valid."
In sum, this agreement contemplated that the University would assume the responsibility for the administration of the Hartford Art School, and that, while the corporation known as HAS, Inc. would continue to exist, its Board of Trustees would no longer have the responsibility for the education of students enrolled in the Art School or for its administrative support. And while it was the understanding of the parties that HAS, Inc. would continue to exist, in its functions and purposes it was made explicitly subordinate to the direction of the University's Board of Regents and the terms of the University's governing documents.
For the most part, since 1960, the relationship between the HAS, Inc. Board and the University's Board of Regents has been cordial and collaborative. Indeed, several of the trial witnesses testified that, during their association with the Art School and the University, they have, at one time or another, served on the Boards of both entities. Also, in the past forty years, members of the HAS, Inc. Board have given generously not only to the Art School, but to the greater University as well.
The nature of the supportive, yet subordinate, role of HAS, Inc. to the CT Page 165 University is reflected in its revised by-laws of 1972 which state: "The purposes and objectives of HAS, Inc. are to monitor and assist the University of Hartford in the conduct of a first quality, fully accredited professional school of fine arts, and further, to promote and encourage the study and practice of fine arts and any related studio disciplines which in its opinion are necessary, valuable and pertinent to the curriculum of such a school." Consistent with these by-laws, the dean of the Art School, traditionally a member of the Board of Trustees of HAS, Inc., has periodically conferred with the Trustees to report on matters regarding the welfare of the Art School and has consulted with the Board concerning issues and directions for the Art School. At all times, however, the dean has been an employee of the University, under the supervision first of its vice president for academic affairs and now of its provost.
The Hartford Art School is an unincorporated "school" that offers college or university level credits in a "program of higher learning" within the meaning of Connecticut General Statutes § 10a-34 (a). The State Board of Higher Education considers the Art School to be a part of the University of Hartford, which is the only corporation licensed and accredited to govern the Art School. The Board of Regents votes to confer degrees on students who graduate from the Art School, and the University of Hartford issues these degrees. HAS, Inc., on the other hand, is a corporate entity which exists for the purposes stated in its by-laws: to monitor and assist the University in fulfilling its educational purposes as they relate to the Art School.
The 1960 agreement between HAS, Inc. and the University contemplated that HAS, Inc. would transfer its then existing endowment to the University upon receiving an approving letter from counsel or a court order. The agreement also constituted a present assignment from HAS, Inc. to the University of endowment funds to be received in the future. Notwithstanding this agreement, HAS, Inc. has not, to this date, transferred any endowment funds to the University, and both parties have treated the original endowment, all endowment funds subsequently received for the benefit of the Art School, and the gains and income from such endowments, as continuing to be owned by HAS, Inc. The University has manifested its understanding of HAS, Inc.'s continued ownership of the Art School endowment in a number of ways. In its financial statements for several years, until the commencement of this litigation, the University included a note indicating HAS, Inc. or the Hartford Art School's ownership of the endowment funds.[1] This understanding is also reflected in the minutes of numerous meetings of the University Board of Regents and its executive committee. Additionally, in the late 1980s, the Internal Revenue Service audited the University's returns and determined that since HAS, Inc. did not, at that time, enjoy tax exempt status, CT Page 166 substantial penalties and interest were due to the government on endowment funds owned by HAS, Inc. In confronting this issue, counsel for the University proposed, as one alternative solution, that HAS, Inc. transfer ownership of the endowment to the University. If the University perceived that it owned the endowment, there would have been no reason for counsel to make this suggestion.
The University's present posture that it owns the Art School endowment is contradicted not only by this past course of conduct but by the terms of an agreement dated November 29, 1990 between the University and HAS, Inc. referring to the unrestricted endowment as that of HAS, Inc. While this agreement dealt only with the unrestricted endowment, reference to its ownership by HAS, Inc. was consistent with the University's treatment of all Art School endowment funds. Certainly, if the University had the view in 1990 that it had title to the Art School endowment, it would not have reasonably seen any need to enter into a written agreement with HAS, Inc. dealing with the University's use of income from the endowment.
From the inception of their relationship until the early 1990s, neither the University nor HAS, Inc. demonstrated any interest in consummating the initial agreement to transfer and assign the endowment to the University. Precise title to the endowment was not a contentious issue in the ongoing relationship between the Boards.
Ownership of the endowment only became a focus for dispute between the HAS, Inc. Board and the Board of Regents when their relationship began to unravel. In 1992, HAS, Inc. decided that it wished to embark on a capital campaign on behalf of the Art School. While HAS, Inc. Trustees had raised substantial funds for the Art School and the University in the past, this venture took on added poignancy due to a number of factors. During this time period, the University was experiencing financial strains due to extrinsic economic factors resulting in projected budget deficits. From the perspective of the Board of Regents, there was concern that HAS, Inc. was seeking to raise funds in its own name, a direction which was seen as separatist and divisive. Regents testified that some of them had heard rumors that HAS, Inc. Board members had told prospective donors that gifts intending to benefit the Art School should be made directly to HAS, Inc., and not the University, because the University was in poor financial condition.
This dispute was also fueled by disagreements and misunderstandings between the Boards concerning the expenditure of Art School endowment funds. In the early years following the 1960 agreement, the HAS, Inc. Board delegated the endowment investment function to the finance committee of the University Board of Regents. HAS, Inc. stayed directly CT Page 167 involved in investment decisions through an arrangement ensuring that a member or members of the HAS, Inc. Board would serve on the University's finance committee. Additionally, Dean Schar, as a member of the HAS, Inc. Board and as dean of the Art School, had ongoing access to University records and reports dealing with endowment expenditures. As to the expenditure of restricted endowment funds, he alone had signature authority over the use of these funds. Over the years, however, the University's internal record keeping and reporting practices were imperfect, causing concerns from time to time among members of the HAS, Inc. Board about both the investment and spending policies regarding endowment funds. In 1989, the HAS, Inc. Board became aware that, as a matter of routine, the University had been applying income from unrestricted endowment funds to meet budgetary operational needs of the Art School. While this practice by the University violated no statutes or accounting norms, it did not comport with the desires of the HAS, Inc. Board that income from unrestricted endowment should be used only for the enhancement of programs, and not to subsidize routine budgetary needs.
After a series of discussions, HAS, Inc. and the University entered into a written agreement dated November 29, 1990 setting forth a policy and procedure for the utilization of income on unrestricted endowment. In sum, the agreement provides for consultation early in a fiscal year with an understanding, in principle, that income from unrestricted endowment is to be used for program enhancement and not to cover routine expenditures. This agreement remains in effect and is binding on both parties. When, several months after the execution of this agreement, HAS, Inc. learned that the University had used income from unrestricted endowments for the 1990-1991 fiscal year budgetary needs, several HAS, Inc. Trustees perceived that the University had violated the 1990 agreement, causing a diminution in trust between the Boards. On reading the agreement, it is the court's view that while the agreement was effective when signed, its terms concerning the use of unrestricted income could not be implemented until the following fiscal year. Otherwise, the provision requiring consultation at the beginning of the fiscal year would be meaningless. However, several members of the HAS, Inc. Board believed that the University's application of endowment income to the 1990-1991 budget year was a violation of the 1990 agreement and a continuation of its pre-1990 policy of utilizing such income to meet budgetary needs. This perception gave rise to requests for explanations and accountings, which were largely ignored by the University.
In this environment of mistrust the University also made a change in its financial reporting which served to escalate the tensions between the Boards. In 1992, the University undertook an examination of all University endowment funds, including the HAS, Inc. endowment, to determine if endowment funds classified as restricted could be CT Page 168 reclassified to unrestricted, and to determine if income from restricted endowment, previously classified as restricted, could be reclassified as unrestricted. While the court heard a great deal of testimony about whether this new reporting format was implemented pursuant to changes made by the Financial Accounting Standards Board concerning financial reporting or was done simply as a means to find funds to assist with the University's deficits, it is clear that in acting unilaterally to reclassify endowment funds without consultation with the HAS, Inc. Board, the Board of Regents vastly underestimated the mistrust it would engender. After reviewing the evidence concerning this issue, the court finds that while the initial reclassifications of Art School endowment funds from restricted to unrestricted and the reclassification of income and gains from restricted endowment to unrestricted were improper, these actions resulted in no harm to HAS, Inc. and caused no diminution of HAS, Inc. endowment funds. Subsequent to the initial reclassifications, the University later corrected its financial statements to reflect the proper classifications. Lawrence Goldstein, CPA, testified credibly that on the basis of his review of the University's general ledger, financial statements, fund managers' reports, tax returns, and audited working papers, no improper expenditures of HAS, Inc. funds were made as a result of the erroneous reclassifications made in 1992 and 1993. In short, this was an accounting error which did not result in improper expenditures. This conclusion is not inconsistent with the results of two audits conducted during this period. This accounting misstep caused no harm to HAS, Inc.
Finally, contributing to the escalation of mistrust between the Boards was the decision by the University in 1995 to omit from its financial statements the notation that HAS, Inc. held title to the Art School endowment. While this tactic was not confiscatory, it was justifiably seen by the HAS, Inc. Board members as adversarial.
The downward spiral in relations between the two Boards resulted in mass resignations from the HAS, Inc. Board at the end of 1993, a 1994 resolution of the Regents that HAS, Inc. should be replaced by a board of visitors, and a statement that HAS, Inc. Board members were not welcome on University property except under limited circumstances. These events ultimately led to the commencement of this litigation in 1995.
This litigation seeks a declaratory judgment for two determinations: the ownership of the Art School endowment and the governance of the Hartford Art School. Pursuant to C.G.S. § 52-29 and Practice Book § 17-55, a declaratory judgment will be rendered only where a claimant:
 a) has a legal or equitable interest by reason of CT Page 169 danger or loss or uncertainty as to his rights or there is an actual bona fide and substantial dispute or substantial uncertainty of legal relations which requires settlement between the parties, and
 b) all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof, and
 c) the court is not of the opinion that the parties should be left to seek redress by some other form of procedure.
The conditions necessary for the issuance of a declaratory judgment have been met in this case.
The court will first consider the ownership of the Art School endowment. While the 1960 Agreement contemplates that the entire endowment would eventually be titled in the University, the parties' subsequent course of conduct constitutes a modification of their original intent.
Whether the parties to a contract intended to modify the contract is a question of fact. Newman Partners v. CFC Construction Ltd.,236 Conn. 750, 761 (1996); Three S. Development Co. v. Santore,193 Conn. 174, 177-78 (1984); Rowe v. Cormier, 189 Conn. 371, 373
(1983). For a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties "must assent to the same thing in the same sense." (Internal quotation marks omitted.) Lar-Rob Bus Corp. v. Fairfield, 170 Conn. 397, 402 (1976); seeFirst Hartford Realty Corp. v. Ellis, 181 Conn. 25, 33 (1980). Modification of a contract may be inferred from the attendant circumstances and conduct of the parties. see Rowe v. Cormier, supra
at 372-73 (1983); Malone v. Santora, 135 Conn. 286, 292 (1949).
From the signing of the 1960 Agreement until 1994, the University consistently represented to the public and to the parties involved that the Art School endowment was owned by the Art School or HAS, Inc. That course of conduct, spanning thirty-four years, modified the 1960 Agreement. By their actions, the parties altered the contractual intent that the endowment would be transferred to the University. Accordingly, in retaining title to the endowment, HAS, Inc. has not breached the 1960 Agreement with the University. Additionally, the court will not order the transfer of the endowment sought by the University. Even absent the modification of the 1960 Agreement by the subsequent conduct of the CT Page 170 parties, the court does not believe that the language of the agreement regarding a court-ordered transfer contemplated judicial intervention in an adversarial context. The endowment, in its entirety, consisting of the principal as of 1960, all subsequent endowment gifts for the benefit of the Art School and all gains and income on such funds, is owned by HAS, Inc.
With regards to the governance issue, HAS, Inc. claims that it is the sole governing body of the Art School. The court is unpersuaded. Governance of the University, including all of its member institutions, lies exclusively within the province of the Board of Regents. The 1960 Agreement clearly states that the member institutions shall be "subject to the control of the University." The fact that the charter of the University and the 1960 Agreement contemplated that member institutions could maintain their corporate structures was unrelated to the actual governance of the schools as member institutions of the University. The argument that HAS, Inc. is the "corporate embodiment" of the Hartford Art School and, as such, is its sole governing body, is without merit both factually and legally. Although HAS, Inc. solely holds title to the Art School endowment, its ownership is contextual. In its capacity as owner of the endowment, HAS, Inc. is obligated by donor intent to utilize the endowment for the Art School as a member institution of the University.
With title to the endowment comes the power to control how the funds are invested and managed. Although the 1960 Agreement provides that the University shall manage the funds, that provision of the Agreement was also altered when the intent to transfer the funds was modified. Management and investment of the endowment is an integral responsibility of ownership. HAS, Inc. may, however, delegate this responsibility to the University if it so chooses. Indeed, since 1960, and reinforced by the 1990 Agreement, the University has managed the endowment with the assent of HAS, Inc. As noted, however, HAS, Inc. holds title to the endowment on behalf of the Art School in its status as a member institution of the University of Hartford. It is constrained in its control of the funds by this relationship as well as by donor intent.
Ownership of the endowment does not confer governance of the Art School on the HAS, Inc. Board of Trustees. Its responsibility to monitor and assist the University contemplates a collaborative yet subordinate role for HAS, Inc. regarding the Art School program. The University Board of Regents has the ultimate authority to establish policy, set the Art School budget and to determine the sources of income to meet the budget. Although HAS, Inc. may propose to the Regents how the endowment will be spent, the University has the authority to determine whether or not to accept endowment money for the benefit of the Art School in the manner proposed by the HAS, Inc. Board. This mandates a collaborative effort by CT Page 171 the parties.[2]
HAS, Inc. has asked for a judicial determination that its Board of Trustees has the exclusive right of governance over the corporation itself. The court agrees. HAS, Inc. exists as a separate entity under the governance of its Board of Trustees and can be dissolved only at the instance of its Board or by judicial determination. Its relationship to the Art School and to the University, however, is defined by the 1957 Act, the bylaws of each entity, the 1960 and the 1990 agreements and applicable law.
HAS, Inc. seeks an order precluding the University from listing the endowment on its balance sheets without the appropriate disclosure that the endowment belongs to HAS, Inc. In support of this claim, HAS, Inc. argues that such action by the University makes the endowment susceptible to claims by University creditors. The court is not persuaded by this argument. Now that title to the endowment has been determined, it is the University's responsibility to report its assets in accordance with generally accepted accounting principles and applicable law. The request for an order dictating how the University should list its assets is denied.
HAS, Inc. claims that the University breached its fiduciary duty in the management of the endowment. Since 1960, the University has been managing the endowment owned by HAS, Inc. The Appellate Court has recently observed that, "Connecticut courts have specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations. . . . (Internal quotation marks omitted) (internal citations omitted) Instead, a fiduciary relationship exists where there is a justifiable trust confided on one side and a resulting superiority and influence on the other." Southbridge Assoc. v.Garofalo, 53 Conn. App. 11, 18 (1999). The court continued, "A fiduciary relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other."Id. citing Dunham v. Dunham, 204 Conn. 303, 322 (1987). The court need not determine the existence of a fiduciary relationship in this case since there was insufficient evidence presented of a breach of such a duty. While the record supports a finding that the University's record keeping and financial reporting were not, at all times, free from error, no harm resulted to HAS, Inc. And while the Board of Regents' manner of dealing with issues raised by the HAS, Inc. Board was, at times, insensitive and overly adversarial, these mistakes in judgment do not constitute actionable conduct.
HAS, Inc. claims that the University has converted the endowment funds CT Page 172 for its own use. Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. Polivy v. Air One, Inc., 46 Conn. App. 573, 577
(1997). To establish a prima facie case of conversion, the plaintiff has to establish that (1) the funds belonged to the plaintiffs, (2) the defendant deprived the plaintiff of their funds for an indefinite period of time, (3) the defendant's conduct Was unauthorized and (4) the defendant's conduct harmed the plaintiffs, see Aubin v. Miller,64 Conn. App. 781 (2001). HAS, Inc. has not presented sufficient evidence of conversion to this court. The dropping of the footnote acknowledging HAS, Inc.'s ownership of the endowment does not satisfy any of the required elements of conversion. HAS, Inc. further claims that the University's reclassification of portions of the endowment funds is tantamount to conversion. While the reclassification was not authorized by the HAS, Inc. Trustees, and was done without their knowledge, the plaintiff has not shown that any of the reclassified funds were actually misspent. Indeed, upon review, the funds were then returned to their original classification. HAS, Inc. has failed to show that it suffered any harm, a key element in a claim for conversion, as a result of the University's conduct.
HAS, Inc. seeks an itemized accounting for the endowment funds from 1960 to the present claiming that such an accounting is necessary to resolve the breach of fiduciary duty and conversion claims. The plaintiff has not presented any credible evidence of misapplication of the endowment funds. As noted, the University's practice of using income from unrestricted endowment funds to support the Art School's budgetary needs through fiscal year 1990-1991 was not improper. As to the reclassifications of funds, neither Mr. Moriarty, the accounting expert for HAS, Inc., nor Mr. Goldstein, the accounting expert for the University, discovered that any endowment funds were misspent. To the contrary, Mr. Goldstein found that the Art School endowment remained intact throughout the process of reclassification. Under the circumstances, an order for an accounting would needlessly cause the expenditure of funds better suited to the University's central purpose of education.
No damages or fees are awarded to either party. Judgment may enter accordingly.
Bishop, J.