[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This proceeding was originally instituted against the corporate defendant alleging breach of contract and unjust enrichment. Subsequent thereto, the individual defendants were also joined on the identical theories of breach of contract and unjust enrichment. The contract or agreement in dispute, with the exception of "two drawings," is essentially oral and, unfortunately, presents all of the problems classic and de minimis generated by an oral contract.[1]
The relationship between the parties is traceable to 1989 when the Hafezes hired Barber to construct several custom wooden showcases for CT Page 4516 their then new store. The evidence disclosed is that he is a master carpenter and cabinetmaker whose work borders on the outstanding. What appears to be in late winter or early spring of 1997, the defendants intended to renovate their store and to utilize additional floor space on the second floor as well as some third floor space in the building which they leased. The planning stage of the renovation project progressed and on June 27, 1997, the plaintiff met with the individual defendants at their home in Wilton. The defendants, being very satisfied with the work that the plaintiff had done earlier for them, were desirous of having him do the cabinetry for the renovated business site that they operated in Greenwich. He had suggested that he handle the entire project, but because of a delay in work that the plaintiff was doing for the defendants on their deck at their home in Wilton, Hani Hafez reused or decided against awarding him the entire project. At this meeting, they agreed that he would construct five (5) showcases like the ones he had provided in 1990, which cabinets would be freestanding, for the agreed price of ten thousand ($10,000) dollars. It is his testimony that this was the only obligation he undertook and the only project awarded to him at that meeting.
The individual defendants alleged that he was to provide various other pieces, such as a fitting room, sweater closets, slot shelves, showcase towers, a cash register cabinet, crown molding, and a library, among other things. The court is satisfied that the only project undertaken or awarded to the plaintiff at that June 27 meeting was the five (5) freestanding cabinets to compliment the cabinets which had been built in 1990. Hani Hafez took Barber to New York City to see various retail stores that represented the appearance he desired to display his products. They visited Holland and Holland and Asprey and Baretta. To further demonstrate the "Hunt Club" appearance which Hafez wanted, with built in closets, rich mahogany and glass cabinets, crown molding and other features, the viewing was in addition to showing the plaintiff postcards and photos of items and appearances that he wanted for the store. Under the oral agreement obviously devoid of plans and specifications, there were elements of the mix, as it were, which might be loosely called drawings, which were sketches, outlines, some pictures, and there was reference to the plaintiffs professional experience. These pieces of paper, and his experience, for lack of a better description, will elicit further comment at a later point in this memorandum.
The individual defendants claim to have set a budgetary limit of twenty thousand ($20,000) dollars with a three week time of completion. How this figure arose is somewhat mysterious in view of the ten thousand ($10,000) dollar quote for the cabinets. Their justification for this budgetary amount was predicated upon the cost of work done by the plaintiff in the late eighties or in 1990 itself The individual defendants' budget and CT Page 4517 time of completion for the items that they claim were to be accomplished by the plaintiff lacked credibility.
On June 26 of 1997, the individual defendants received a quote from Century Woodworking, Incorporated for seventeen (17) units of cabinets and pre-finished dressing room walls, bench and doors for a price of forty-three thousand three hundred fourteen ($43,314) dollars, and referenced certain drawings by one Pat Ulitiano who apparently was the architect for this particular project. That quote applies to the firstfloor only and contains a shipping or completion date of "the third week of August, 1997," which time limit closely approximates a term of eight (8) weeks from the date of the plaintiffs proposal. The Century quote lists the cash register unit to have a Formica top. It excludes all hanging metal fixtures as well. It did not include any brass racks on the first floor work items. The plaintiff was hired to perform woodworking only that did not include any brass racks. In fact, the list refers to certain items, specifically eleven (11) and thirteen (13), to be "bought by H.H."
Reverting to the proposal for the 1990 work, which the individual defendants declare they relied upon, was the provision that all additional work was to be performed on a time and material basis with a labor rate then of thirty-five ($35) dollars per man hour. The charges incurred for the plaintiffs services on that project were paid and apparently were not controverted in any sense of the word. The relationship between the parties as well as the evidence offered suggests a rather subtle attempt to create the impression that this parol agreement embraced the concept of time being of the essence in this relationship. Subtle though it may be, there is absolutely no evidence to remotely support such an understanding.
The primary contractor for the renovation of the building was the Chimblo Development and Construction Company of Greenwich. The original price, which was said to be based upon architectural drawings only, was one hundred thirty-one thousand ($131,000) dollars. That figure was contained in a bid or an estimate dated June 4, 1997, and was amended by a subsequent agreement as a result of negotiations on July 2 to one hundred twenty-five thousand nine hundred sixty-six ($125,966) dollars. While that contract was with an entity known as EuroChasse, the individual defendants agreed with the owner of the property, Richard Foster, that he would pay three-quarters (3/4) of the debt; the individual defendants would pay one-quarter (1/4) of the said debt. The schedule for the work to be accomplished by Chimblo was as follows:
June 10, 1997: the signing of the contract CT Page 4518
 June 11, 1997: start work
 July 31, 1997: complete the second and third floor
 August 1, 1997: start first floor
 August 31, 1997: complete the first floor
The disparity between what the individual defendants express as the time allotted to the plaintiff to complete the work he was to perform is inconsistent with the time schedule set forth by Chimblo. Chimblo experienced delays in its renovation, and a certificate of occupancy was not obtained until September 17, 1997. There were seventeen (17) change orders in that contract and, as noted in testimony, such change orders almost always add time and money to the project unless they are credits. There were very few credits allowed on this particular project.[2] The individual defendants assert that they contemplated a grand reopening on or about August 15 of that year. They failed to reach that date as well as an extended date. It was rescheduled for September 25 of that year and ultimately occurred on October 9.
Four (4) cabinets of the five (5) originally agreed upon were delivered and assembled toward the end of July or the first week in August. At that time, some of the old cabinetry was removed from the first floor and reinstalled on the second floor. The plaintiff was delayed in many of his efforts by the installation of the sprinkler system, the erection of walls and the laying of carpet, among other things. In this litigation, however, the individual defendants attempted to blame the plaintiff for each and every day of delay that occurred in their project. The court finds that position to be untenable. Hafez himself admitted that Chimblo delayed the grand opening in August for "maybe a month." It became quite obvious as the case progressed that the original agreement for the five (5) cabinets grew by leaps and bounds to include many other items. The additions were reached by the same agreement variety, i.e., oral. The individual defendants' reliance upon the 1989 or 1990 work and the price therefor ignored a provision in the original agreement which recited that "all additional work to be performed on a time and material basis with a labor rate of $35 dollars per man hour to be applied." The original invoice, which was paid, contained an item of "additional man hours billed at $35 per hour." In 1997, the reasonable value of the plaintiffs services and for his men and his shop was fifty-five ($55) dollars per CT Page 4519 hour for shop work and forty ($40) dollars for site work. There was a charge of twenty-five ($25) dollars per hour for the plaintiffs subcontractors.
The controversy over the obligations of the plaintiff under the original agreement and the subsequent requests of the individual defendants is only possible of resolution by the court's determination of the credibility of the parties. It finds the credibility of the plaintiff to be far superior to the credibility of the individual defendants. This finding is not a universal acceptance of the plaintiffs position, however, but at least a substantial acceptance thereof
It is interesting to note that correspondence between the individual defendants and the plaintiff on EuroChasse stationery setting forth complaints ended with words such as "regards" and/or "sincerely." With the exception of the claims of unnecessary and unreasonable delays, the testimony about defective workmanship in terms of timeliness were expressed for the first time after the ultimate billing was sent and received. The defendants' exhibit five (5), which is appended hereto and fully incorporated by reference as exhibit one (1), lists six (6) complaints under the date of September 22, 1998, which amount to little more than a punch list at that time.
One of the major complaints dealt with the doors of the cabinets. They were originally designed as glass doors. The individual defendants, however, changed them from glass to wood, and in the plaintiffs words, the difference in weight caused the doors to jump the tracks that held them. This was a complaint which was consistent throughout the trial. The second issue set forth in that exhibit is the failure to build two towers "as per the original plan." The court finds that such towers were not included within the "original plan." The third and perhaps most significant complaint is the problem with the access from the staircase landing to the front display window. It appears as though there is no easy way to gain access to that front display window without straddling the railing on the landing which to this court presents a rather hazardous means of access and egress thereto. The fourth is devoted to fixing a broken piece of wood on top of the staircase bordering the carpet. The fifth is the absence of a top molding or crown molding. The court does not find that was within the original agreement.[3] And the last was that the changing room door did not close properly. There also was a complaint which presented itself with respect to the height of the counter for the cash register. The significance of this complaint, according to the testimony of the individual defendants, seems greatly exaggerated. This is not to say that there is not a complaint there but the extent thereof is of little impact. Complaints about the quality of the workmanship and material were not voiced by any of the witnesses CT Page 4520 called with the exception of the individual defendants.
Anthony Chimblo testified that he was not aware of any complaints with the plaintiffs workmanship. There might have been a complaint, however, on the schedule as a result of the changes that the individual defendants made. There were no problems with the freestanding cabinets with the exception of the counters being too high and the fitting room door. An electrician, one Joseph Ferriss, who installed the display lighting on the cabinets, testified that the mahogany in the cabinets was high quality, good workmanship consistent with high end work. One of the plaintiffs subcontractors, a John Marques, noted that the individual defendant Hani always instructed him on changes and other things with words such as: "You're not going to leave me with that/Do this." He testified that he had heard the individual defendant Hani describe the plaintiffs work as expensive but excellent, what he wanted, that money was no object, just get it done. "I know we owe you a lot a money, but just get it done."
The individual defendants contacted one Joseph Mirando, of South Salem, New York. Mr. Mirando was a thoroughly qualified expert witness who commented that the cabinet work was excellent. He did confirm, however, that the doors did not work properly with respect to the opening and closure and the problem with jumping the tracks. He also commented on the access to the display window. Here again, the testimony that he was able to provide suggests little more than a punch list with the exception of access to the display window. On the day prior to his actual appearance and testimony, the individual defendants attempted to offer his report. It was offered as a business entry, and the objection to it was sustained. On the day that he testified, an objection to his testifying with respect to the cost to cure, if any, was sustained as well. He had never been disclosed as an expert, and the contents of his testimony were never disclosed as well. He was the last witness in the case in chief for the defense. An offer to permit the plaintiff to depose him later on that day was denied as certainly untimely and completely dilatory. He, too, was not hired because he was too expensive.
With respect to the attempt to offer his appraisal as a business entry under § 52-180 of the General Statutes, essentially all that is required is that the writing be in the regular course of business to make it "the writing or record." Keeping a report in a file which serves as a basis for certain actions that are taken as a result thereof, in all probability satisfies the requirement of a record. However, the keeping of such report in this instance was not in the individual defendant's general course of business. These statutory requisites simply were not satisfied. This is not to say, however, that the documents sought to be introduced must be prepared by the organization itself to be admissible CT Page 4521 as that organization's business records. See Crest Plumbing HeatingCo. v. DiLoreto, 12 Conn. App. 468, 476-77. The record offered here was not made by the witness except in the sense that she incorporated it into her own files. There is nothing that can be found on the evidence offered to show that the conditions prescribed by the statute as they apply to this record were met. Orzechowski v. Higgins, 146 Conn. 463, 466; Wellerv. Fish Transport Co., 123 Conn. 49, 59; Jordan v. Apter, 93 Conn. 302,306. Therefore, while it may be a "writing or record," it does not satisfy the statutory requisites and was therefore excluded.
The court finds that the reasonable value of the labor and materials provided to the individual defendants to be ninety-two thousand six hundred sixteen dollars and sixty-nine ($92,616.69) cents. That figure represents materials in the amount of twenty-two thousand one hundred forty-four dollars and nineteen ($22,144.19) cents and labor including subcontractors of seventy thousand four hundred seventy-two dollars and fifty ($70,472.50) cents. The defendants have paid on account the sum of thirty-three thousand ($33,000) dollars. The mathematical balance owing is fifty-nine thousand six hundred sixteen dollars and sixty-nine cents ($59,616.69).
The plaintiff asserts that a prior action had been commenced against the defendants which had been dismissed for a technical defect and was not heard on the merits. The defendants also refer to this particular occurrence and recite that there was no communication between the parties until September, 1998 when Barber sued the Hafezes. The suit was dismissed shortly thereafter. Clearly, both parties referred to a prior action between them. However, despite the fact that each of the parties refers to the prior litigation in their prospective findings and counter-findings, there is no evidence before the court that will permit the plaintiff to avail himself of the accidental failure of suit statute and perhaps defeat what appears to be a problem with the statute of limitations. See § 52-592 of the General Statutes. Therefore, if the plaintiffs case rested solely on the allegation of "various oral agreements only," the defense might well prevail. The plaintiff, however, has also set forth the cause of action based upon an implied contract and unjust enrichment.
A contract implied in fact like an expressed contract depends upon actual agreement. Therrien v. Safeguard Mfg.Co., 180 Conn. 91, 94. An implied contract is an agreement between the parties which is not expressed in words which is inferred from the acts and the conduct of the parties. The test is whether the conduct and the acts of the parties show an agreement. Brighenti v. New Britain Shirt Corporation, 167 Conn. 403,406. This court is quite satisfied that indeed the contract (s) implied in fact arose subsequent to the June 27 oral agreement. It is quite CT Page 4522 evident from the credible evidence heard that as the relationship between these parties continued, there were many requests for additional work which the plaintiff apparently agreed to perform on a time of material basis. The plaintiff testified as to the reasonable value of the services which he rendered in terms of his labor, the labor of a subcontractor, and the court finds that testimony quite credible. It defies logic to suggest that the services rendered according to him and the complaints asserted by the defendants involve substantial work not the subject of any formal contract, but clearly of a contract implied in fact. This finding predicated upon the credibility of the witnesses removes the case from the sting of § 52-581 and places it squarely within the provisions of § 52-576 of the General Statutes. It should be remembered that quantum meruit and unjust enrichment along with quasi contract are each based upon common law principles of restitution, are all non-contractual actions by which a party may recover despite the absence of valid contract and are often collectively referred to as quasi contract claims. Sidney v. Devries, 215 Conn. 350, 351-52 n. 1. The plaintiff is entitled to judgment on the allegation of quantum meruit as well as implied contract.
The settled rule that the statute of limitations begins to run upon the accrual of a cause of action applies in actions on implied and quasi contracts. 51 Am.Jur.2a, Limits of Actions. In an action for breach of contract, the cause of action is complete upon the occurrence of the breach, that is, when the injury has been inflicted. Kennedy v.Johns-Manville Sales Corporation, 135 Conn. 176, 180. Here the right of action may be said to have accrued upon the completion of the services rendered. In this case, the plaintiff finished performing his services with the installation of the changing room in February of 1998. This principal would also save the plaintiffs claim if based on "various oral agreements." See Gaylord Hospital v. Massaro, 5 Conn. App. 465, 466.
"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Citations omitted; internal quotation marks omitted.) CT Page 4523Gardner v. Pilato, 68 Conn. App. 448, 452-453; HartfordWhalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276,286-87. In a determination of whether a particular failure to pay was unjust and whether the defendant was benefitted, are essentially factual findings for the trial court. Hartford Whalers Hockey Clubv. Uniroyal Goodrich Tire Co., supra citing therein Stabenau v.Cairelli, 22 Conn. App. 578, 581. Ordinarily, damages in an unjust enrichment case are "not the loss to the plaintiff but the benefit to the defendant" and a fact finder may rely on the plaintiffs bill when the benefit is too difficult to determine otherwise. HartfordWhalers Hockey Club v. Uniroyal Goodrich Tire Co., supra, 285. A plaintiff is competent to give his opinion as to the reasonable value of the his own services after they have been described with reasonable particularity. Pleines v. Franklin Construction Co., 30 Conn. App. 612,618; citing Anderson v. Zweigbaum, 150 Conn. 478, 483; Gardner v.Pilato, supra, 455. The plaintiffs testimony together with the testimony of those who observed the labor and work product which he supplied lead to the unmistakable conclusion that his opinion as to the reasonable value of his services was indeed accurate and proper. The plaintiffs have indeed proven their claim of unjust enrichment.
The defendants' second special defense with the allegations breached the agreement by the plaintiff by failing to complete the project in a timely fashion and/or in a workmanlike manner is not persuasive. There was evidence from the defendants as much as the prime contractor himself that the prime contractor delayed the projects as well as any complaints about the plaintiff There was also evidence which the court finds to be credible that the defendants themselves delayed the project and that any delay by the plaintiff was merely part of the entire mosaic. As previously indicated the opinions of the quality of the work that were offered by the witnesses who saw it belie the second part of the second special defense with respect to workmanlike manner. Once again the defendants cannot prevail on that special defense.
The accord and satisfaction claim presents no obstacles to the plaintiff "When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. . . . An accord is a contract between creditor and debtor for the settlement of a claim by some performance other than that which is due. . . . Without a mutual assent, or a `meeting of the minds,' there cannot be a valid accord." (Citations omitted; internal quotation marks omitted.) Newman Partners v. CFC Construction Ltd., 236 Conn. 750,764.
To prove accord and satisfaction, the defendant must show that at the CT Page 4524 time of the agreement there was a good faith dispute over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim. Peerless HosieryCo. v. Northern Ins. Co., 108 F. Sup. 52, 55-56 (D. Conn.) aff'd,199 F.2d 957 (2d Cir. 1952). The accord must be a new agreement based on new consideration. Crucible Steel Co. v. Premier Mfg. Co., 94 Conn. 652,656. The proponent must be able to show that there was a meeting of the minds, and that the offer by the debtor was clearly tendered as full satisfaction of the debt and that the payment was knowingly accepted.Crucible Steel Co. v. Premier Mfg. Co., supra. Munroe v. EmhartCorporation, 46 Conn. App. 37, 42-43. "Without a mutual assent, or a meeting of the minds, there cannot be a valid accord." Whether a meeting of the minds has occurred is a factual determination. M.J. Daly Sonsv. West Haven, 66 Conn. App. 41, 48. Any payment that he may have received was merely a portion of the work done to date with the exception of the initial deposit. It becomes ludicrous to even suggest that the amount of work that he performed was performed in accordance with the price for the June 27th agreement. The court finds no good faith dispute over a debt or the amount thereof, no contract to settle that dispute — new contract and no meeting of the minds. None of the requisites of the doctrine can be predicated on this evidence. There is no merit to this defense.
The defendants in their counterclaim recite that the defendant is Hafez and Hafez Company, Incorporated. The only reference to the corporation appears in the defendants' exhibit eleven (11) which is addressed to the corporation by a non-party supplier. There is no suggested relationship between Melvin S. Roos, Inc. and the plaintiff It is not disputed that there is such a corporation and presumptively it is in good standing. However, the individual defendant, Hani Hafez, admits no signatures suggesting any corporate capacity, no writings involving the corporation and no activity between the plaintiff and the corporation. This relationship between the plaintiff and the defendants is clearly one which a personal one and despite their desirability and effort to establish the corporate defendant as the only defendant, that effort must fail.
Interestingly enough, correspondence on any letterhead whatsoever from the defendant is on stationery or paper goods under the name EuroChasse. Under that bold title the following words appear, "European Hunting and Country Clothing." There is no evidence in the case whatsoever that EuroChasse is a corporation duly organized and existing in any jurisdiction. In addition thereto, there is no suggestion that it is a fictitious business name and not even a remote reference to compliance with § 35-1 of the General Statutes. Other than the implication of the letterhead or logo, no shield or refuge is claimed or offered under CT Page 4525 that name. The court finds the individual defendants to be the responsible, chargeable and ultimately liable individuals for this project.
The defendants also assert that they were highly prejudiced by the delay and completion and delivery of materials and services provided by the plaintiff The evidence fails to establish such prejudice and not one cent of damage arising from the claimed prejudice to the defendants was offered in support of their position. There was no evidence of loss of sales, no comparison between sales years to show such a loss, and no evidence whatsoever of profits or lack thereof
Earlier in this memorandum, the court alluded to certain problems that did in fact arise out of the plaintiffs performance. Those problems were difficulties categorized by the court as expressed on a punch list which is hardly of any great significance. It does not appear, however, that the punch list was ever corrected as it was dated September 22, 1998, long after any relationship existing between the parties had deteriorated. The court, relying on its own experience and knowledge, awards the sum of seven thousand five hundred ($7500) dollars to the defendants to correct the complaints listed in the defendants' exhibit five (5) (the punch list). Despite the defendants' protestations, the court finds that that list was the only credible complaint that they had with the plaintiffs work.
With that credit applied, judgment may enter that the plaintiff recover the sum of fifty-two thousand one hundred sixteen dollars and sixty-nine ($52,116.69) cents of the individual defendants together with costs of suit. Judgment may also enter in favor of the corporate defendant on the plaintiffs complaint.
 ___________________ Moraghan, J.T.R.
EuroChasse
EUROPEAN HUNTING COUNTRY CLOTHING
 Exhibit I (Defendants' Exhibit 5)
To: Stephen J. Curley Winthrop Stimson
Re: Michael Barber vs. Hani Marilyn Hafez
September 22, 1998 CT Page 4526
The following is a list of the items which we would like to be completed.
1. The doors of the showcases are not functioning properly. They need to be re-done in the same fashion as the old showcases.
2. Build the two towers as per original plan.
3. Fix the staircase opening for access to the front window.
4. Fix broken piece of wood on top of staircase bordering on carpet. Someone could trip the way it is right now.
5. Top moulding.
6. Changing room door does not close properly.