CHARLES R. KLINE *v.* GERTRUDE KLINE
(AC 25792)

Gruendel, Harper and Berdon, Js.

---

[1] Although named as a defendant in this action, the city of New Britain is not a party to this appeal.

Argued January 10—officially released May 29, 2007

*Christopher P. Norris,* with whom were *Barbara A. Kershaw,* and, on the brief, *William R. Donaldson III,* for the appellant-appellee (defendant).

*Peter M. Haberlandt,* with whom was *Steven D. Ecker,* for the appellee-appellant (plaintiff).

GRUENDEL, J. The plaintiff, Charles R. Kline, appeals[1] from the judgment of the trial court denying his postdissolution motion for an order seeking repayment from the defendant, Gertrude Kline.[2] On appeal, the plaintiff claims that the court improperly rewrote the applicable article contained within the parties' separation agreement. We agree with the plaintiff and, accordingly, reverse in part the judgment of the trial court.[3]

The following undisputed facts and procedural history are relevant to the plaintiff's appeal. The parties divorced on May 19, 1995. The judgment of dissolution incorporated the terms of a separation agreement that had been signed by the parties on the day of the dissolution.[4] The plaintiff was employed by Union Carbide

[1] The defendant, Gertrude Kline, initially appealed from the judgment of the trial court denying her motion for contempt, and the plaintiff cross appealed from the judgment denying his motion for an order seeking repayment from her of certain sums allegedly overpaid. Thereafter, the defendant withdrew the appeal on February 14, 2006, and this court decided the matter on the plaintiff's cross appeal.

[2] Subsequent to the dissolution, the defendant changed her name to Gertrude Patron as a result of her remarriage. Her former name remains for purposes of this appeal.

[3] We decline to review the defendant's two alternate grounds for affirmance because the court did not find the requisite facts for her claims of mutual mistake and equitable estoppel. Because the defendant did not file a motion for articulation, therefore, we cannot review her claims. Our Supreme Court has held that "[o]ur rules regarding the need to seek an articulation of the factual basis of the trial court's decision are well settled. It is the responsibility of the appellant to move for an articulation in order to clarify the basis of the trial court's decision should such clarification be necessary for effective appellate review of the issue on appeal. . . . It is, therefore, the responsibility of the appellant to move for an articulation or clarification of the record when the trial court has failed to state the basis of a decision. . . . *These rules have equal import when the appellee seeks to affirm the judgment on an alternate ground.*" (Citations omitted; emphasis added.) *Zahringer* v. *Zahringer,* 262 Conn. 360, 370, 815 A.2d 75 (2003).

[4] The separation agreement was the culmination of negotiations between the parties, each of whom was independently represented by counsel. Article fifteen of the separation agreement states: "Each party represents that both the legal and practical effects of this Agreement in each and every respect

Corporation (Union Carbide) and had accumulated a series of options to purchase stock in the corporation and one of its divisions as compensation for his services.[5] Article 20 (b) of the separation agreement provides that the plaintiff "shall pay to the [defendant] a sum equal to fifty percent . . . of the net, after-tax proceeds realized by the [plaintiff] from his exercise of the stock options granted and exercisable through December 31, 1994." The article continues by stating that the plaintiff "will use his best efforts to maximize the amount to be realized from his exercise of these options. The [plaintiff] shall not be required to exercise any options which will not result in a net profit. Otherwise, the [plaintiff] shall exercise the options prior to their respective expirations and he shall pay over to the [defendant] such sums as may be due to her within thirty days of his receipt of the net proceeds."

Article twenty-one involves real property located at 18 Big Buck Lane in Brookfield. The article provides that the defendant "shall have the option to either purchase the [plaintiff's] interest in the premises or list the property for sale. In the event that the [defendant] has, for any reason whatsoever, not listed the property for sale within six months from the date of the execution of this Agreement, then in that event the [defendant] shall be required to purchase the [plaintiff's] interest in the premises. Time is of the essence to this date." The remainder of the article concerns the specifics of the sale of the real property to a third party or the

have been fully explained to each of them by counsel of his or her choosing and each acknowledges that this is a fair Agreement and not the result of any fraud, duress or undue influence exercised by either party upon the other."

[5] Apart from Union Carbide, the plaintiff was given options to purchase stock in the Linde Division, which later became Praxair, an independent company. Thus, the plaintiff's stock options were divided between the two companies.

defendant's purchase of the plaintiff's interest in such property.

Article twenty-four provides that "[t]he parties have hereinabove agreed to a division of the [plaintiff's] stock options and to the division of the real estate. When the [plaintiff's] interest in the real estate is determined by sale or purchase as previously set forth, the [defendant] shall have the option to retain a sufficient portion from the [plaintiff's] proceeds as an offset against her portion of the stock options yet to be exercised. It is understood and agreed that should the [defendant] so elect then in that event her portion of the stock option proceeds and any offset shall in no event exceed the maximum of $209,000."[6] The article then offers an example of the manner in which the exchange would proceed; concrete monetary figures are inserted to represent a hypothetical situation in which the combination of the defendant's receipt of proceeds from prior options exercised and the plaintiff's established interest in the real estate are subtracted from $209,000.

On January 6, 1997, the plaintiff filed a motion for contempt, alleging that the defendant exceeded the six month time period in which either to list for sale or purchase the plaintiff's interest in the real property pursuant to article twenty-one. In response to the motion, the defendant elected to purchase the plaintiff's interest in the marital home. It was undisputed that the plaintiff's interest in the home at this time was $81,000. The plaintiff continued to pay the defendant the proceeds from the stock options.

On May 21, 2001, the plaintiff filed the postdissolution motion for order, claiming that his payments of stock option proceeds to the defendant exceeded the $209,000

---

[6] The $209,000 figure was derived from one half of the $418,000 estimate of the value of the stock option proceeds after taxes at the time the separation agreement was signed and made part of the dissolution judgment.

cap contained in article twenty-four by $56,713.76.[7] In his motion, he requested an order for the repayment of that amount, plus costs and attorney's fees.[8] On June 15, 2001, the defendant responded by filing two post-judgment motions for contempt regarding alimony and property. On March 12, 2002, a hearing was held before the court, *Doherty, J.*, on all three motions. In a memorandum of decision filed March 10, 2003, the court denied the plaintiff's motion for order. This appeal followed.[9]

"Where a judgment incorporates a separation agreement, the judgment and agreement should be construed in accordance with the laws applied to any contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here

---

[7] The plaintiff arrived at the calculation by claiming that stock options were cashed on January 27 and 28, 1997, resulting in a total of $92,158.49. Because the plaintiff's interest in the marital home was $81,000, the plaintiff paid the defendant $11,158.49 in stock option proceeds to reach that amount. In addition, prior to the defendant's purchase of the plaintiff's interest in the marital residence, the defendant had received $46,055.65, and subsequent to the purchase of his interest, the defendant received $127,499.62 in stock option proceeds. He added these figures to his $81,000 interest in the marital home that the defendant had elected to receive in stock option proceeds and arrived at the sum of $265,713.76. Because his payments to the defendant could not exceed the $209,000 cap, the plaintiff claimed that he overpaid by $56,713.76.

[8] In addition, the plaintiff claimed that he paid $3525 in alimony payments that were not due the defendant pursuant to article seventeen because of her remarriage. The defendant never cashed the alimony checks, and the plaintiff withdrew this portion of the motion.

[9] The court also denied the defendant's motion for contempt regarding alimony and directed that the defendant's motion for contempt regarding property be "reclaimed and argued in detail in order for the court to enter appropriate orders thereon." Subsequent to the filing of the parties' briefs in this appeal, the court, *Hon. Sidney Axelrod*, judge trial referee, issued a memorandum of decision on October 27, 2006, denying the defendant's motion for contempt regarding property.

there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . The court's determination as to whether a contract is ambiguous is a question of law; our standard of review, therefore, is de novo. . . .

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Internal quotation marks omitted.) *Russell* v. *Russell*, 95 Conn. App. 219, 221–22, 895 A.2d 862 (2006).

Article twenty-four governs the defendant's "option to retain a sufficient portion from the plaintiff's proceeds [from the real property] as an offset against her portion of the stock options yet to be exercised." Our review of the article reveals that the language is clear and unambiguous and is followed by an example that further underscores the meaning of the provision. In the example, $209,000 provides the starting point from which the previously received stock options and the plaintiff's interest in the real estate are subtracted, leaving the balance due to the defendant, if any. After the description of the example, hypothetical numbers are used, in which $29,000 in prior options exercised and

$115,000 in the plaintiff's estimated interest in the real estate are subtracted from $209,000, leaving $65,000 due to the defendant. It is clear that $209,000 is the maximum amount that the defendant could receive from *both* the stock options *and* the plaintiff's interest in the home.

The court considered the following sentence from article twenty-four, regarding the defendant's election to exercise the option to purchase the plaintiff's interest in the real property: "It is understood and agreed that should the [defendant] so elect then in that event her portion of the stock option proceeds and any offset shall in no event exceed the maximum of $209,000." Despite this unequivocal language, the court found this sentence of article twenty-four to be ambiguous and offered its own interpretation: "It is understood and agreed that should the [defendant] so elect then and in that event her portion of the stock option proceeds [and any] *to be used as an* offset shall in no event exceed the maximum of $209,000." (Emphasis in original.) Accordingly, the court unquestionably changed the language to reflect that the defendant was entitled to receive substantially more money than article twenty-four dictated.[10] Although the court stated that the plaintiff's interpretation was not what it found "to have been

---

[10] The court found that the plaintiff's interpretation of the agreement was "especially incongruous in view of the fact that when all was said and done, the plaintiff's interest in the property amounted to (only) $81,000, and the value of the stock options otherwise owing to the defendant was an amount considerably in excess of that figure." Even were we to go beyond the clear and unambiguous language of the contract to consider the intent of the parties and the fairness of the bargain at the date of dissolution, it is undisputed that the stock options at that time were worth about $418,000 after taxes, half of which would be due and owing to the defendant if she were to collect the proceeds on that date. See footnote 6.

As the plaintiff explained during direct examination, article twenty-four was added because "options have no sure value. They're whatever you have. You're given a price. And if the stock price goes above that price and you sell them, you make a profit. If it goes below that number, it's called 'under water,' and you have no value. And, so, it's a gamble. And I said I wasn't willing to take the risk of turning over my entire share in the house on

[the parties'] true intention when they added article twenty-four," the court's rewriting of this sentence was improper. See *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 760, 674 A.2d 1313 (1996) ("[i]t is axiomatic that courts do not rewrite contracts for the parties").

The defendant argues that because neither the language of article twenty-four nor the example given had any provision for repayment, the plaintiff's interpretation makes article 20 (b), the article governing stock options, meaningless. The defendant gave two examples in her brief. In one example, she already had received $100,000 in stock option proceeds, and the plaintiff's interest in the real property was $115,000. The defendant argued that together, they would exceed the $209,000 cap listed in article twenty-four by $6000. This argument is flawed because the express language in article twenty-four provides that the defendant "shall have the option to retain *a sufficient portion* from the [plaintiff's] proceeds . . . ." In the defendant's hypothetical, therefore, she would only be relieved of paying the plaintiff $109,000 in cash and would be required to pay him the remaining $6000.[11]

options, especially working for Union Carbide at the time. Had they had another Bhopal [disaster] Union Carbide stock would have been—would have made Enron's [fallen stock price] look expensive, I think. I just couldn't count on that value." Article twenty-four was a compromise that allowed the defendant not to have to pay the plaintiff cash for the real property and permitted the plaintiff some assurance that he would not be required to rely solely on stock option proceeds.

[11] The defendant's other hypothetical suggested that she already could have been in possession of $300,000 in prior options exercised, clearly exceeding the $209,000 cap the plaintiff claimed that article twenty-four dictated. Although the defendant waited more than one and one-half years to exercise her article twenty-four option, however, it is undisputed that the agreement required that she do so within six months. At the time of the agreement, it was established that the defendant's entire portion of the stock option proceeds was worth $209,000, well below the $300,000 given in the hypothetical. In actuality, after six months, the plaintiff had exercised only two of the fourteen article 20 (b) options, as he was entitled to do under article 20 (b), which resulted in the payment of $31,871.77 in proceeds to the defendant.

We conclude by noting that the defendant had the *option* to sell the real property to a third party *or* purchase the plaintiff's interest in the property. She was required to exercise the second option due to her inaction within the allotted six month time period, pursuant to article twenty-one; article twenty-four made clear the income to which she would be entitled. "[C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement; contracts voluntarily and fairly made should be held valid and enforced in the courts.*" (Emphasis in original; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 505–506, 746 A.2d 1277 (2000). The language of the separation agreement is clear and unambiguous and is to be given effect in accordance with its terms.

The judgment is reversed on the plaintiff's motion for order and the case is remanded with direction to render judgment for the plaintiff on his postdissolution motion.

In this opinion the other judges concurred.